UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10194-GAO

UNITED STATES OF AMERICA

v.

DAVID P. GAW,
Defendant.

OPINION AND ORDER
May 30, 2014

O'TOOLE, D.J.

The defendant is charged in a seventeen-count Indictment with participating in a scheme to profit by selling fraudulently obtained state-issued vehicle inspection station licenses. Counts I through XVI charge the defendant with committing and aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 2, 1341, and 1346. Count XVII charges him with conspiring to commit Hobbs Act extortion in violation of 18 U.S.C. § 1951.

The Massachusetts Registry of Motor Vehicles ("RMV") licenses service station owners to conduct mandatory annual vehicle inspections. The licenses are coveted because they attract business to the stations, but they are limited in number. The indictment alleges that at the relevant time there was a waiting list for stations seeking to obtain a vehicle inspection license. Under RMV regulations, inspection licenses are non-transferable. In the case of a change in ownership of a station or its merger with another station, the new owner or merged entity must submit a new application. However, the RMV had a policy of granting licenses to new owners or merged entities ahead of other stations the waiting list.

The indictment alleges that the defendant was a Senior Inspector employed by the RMV. His duties included inspecting stations applying for licenses to ensure they met the program's specifications. Mark LaFrance was the Project Manager for Vehicle Safety and Compliance Services. LaFrance had oversight duties for the entire inspection program. He maintained the waiting list and reviewed and approved applications. Simon Abou Raad owned two service stations and was a friend of LaFrance.

The Indictment alleges that the defendant schemed with Abou Raad and LaFrance to operate what was effectively a black market for inspection licenses between 2009 and 2013. As part of this scheme, LaFrance identified stations that had low volumes of inspections or intended to surrender their licenses. Abou Raad purchased the licenses and inspection equipment from such stations for $5,000 to $6,000 and arranged to sell them, by means of the scheme, to other stations for prices between $50,000 and $75,000. Gaw is alleged to have helped identify potential buyers for the scheme. According to the scheme, Abou Raad would submit forged paperwork to the RMV making it appear that there had been a bona fide merger or a change in station ownership, which paperwork LaFrance then would get approved ahead of applications on the waiting list. The defendant is also alleged to have conducted pre-transfer inspections of the service stations getting the new licenses based on the forged paperwork. According to the Indictment, Abou Raad split the proceeds with LaFrance and paid the defendant a kickback if he had identified the buyer or performed the inspection for the particular transaction.

The defendant has moved to dismiss the Indictment, arguing that it contains insufficient allegations to charge him with the stated crimes.

**I.     Legal Standard**

A criminal indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment simply needs to give the defendant notice of the charges against him, United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002), and "is sufficient if it describes all elements of the charged offense using the words of the relevant criminal statute," United States v. Wells, 766 F.2d 12, 22 (1st Cir. 1985). In evaluating the sufficiency of an indictment, the Court assumes the veracity of its allegations and does not inquire whether the government can prove its case. United States v. Dunbar, 367 F. Supp. 2d 59, 60 (D. Mass. 2005) (citing Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952)).

**II.    Discussion**

   **A.    Money-or-Property Mail Fraud**

Counts I through XVI charge the defendant with committing mail fraud, in violation of 18 U.S.C. § 1341. Mail fraud consists of three key elements: "(1) a scheme or artifice to defraud; (2) the defendant's knowing and willing participation in the scheme to defraud with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme." United States v. LaPlante, 714 F.3d 641, 644 (1st Cir. 2013). Traditional mail fraud, as distinguished from honest-services mail fraud, concerns only schemes to deprive persons of money or property. See Cleveland v. United States, 531 U.S. 12, 18–20 (2000). To constitute property under § 1341, "the thing obtained must be property in the hands of the victim." Id. at 15. Allegations that a defendant merely made misrepresentations to the government in connection with a license application are insufficient to charge mail fraud because licenses are not property in the hands of the state.

The defendant contends that the Indictment is insufficient to charge him with mail fraud, as either a principal or an aider and abettor, because the inspection licenses involved here are not property in the hands of the RMV. See id. at 26–27. If the Indictment alleged only that the defendant participated in a scheme to obtain licenses from the RMV through misrepresentations, his argument might have some merit. But the Indictment expressly alleges that the defendant participated in a scheme "to obtain money and property, *that is money from service station owners seeking inspection licenses*." Indictment ¶ 9 (dkt. no. 3) (emphasis added). The mail fraud statute does not require "that the party deprived of money or property be the same party who is actually deceived." United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998). Accordingly, the defendant's argument that the Indictment fails to charge traditional mail fraud is without merit.

### B. Honest-Services Mail Fraud

Counts I through XVI also charge the defendant with devising a scheme or artifice to defraud Massachusetts citizens of their right to honest services, in violation of 18 U.S.C. § 1346. In order to convict an individual of honest-services fraud, the government must prove, and the Indictment must allege, a *quid pro quo* arrangement. Skilling v. United States, 130 S. Ct. 2896, 2931 (2010) (holding that § 1346 criminalizes only bribes and kickbacks). In this context, "a bribe is the receipt of 'anything of value . . . in return for . . . being influenced in the performance of any official act.'" United States v. McDonough, 727 F.3d 143, 152 (1st Cir. 2013) (alterations in original) (quoting 18 U.S.C. § 201).

The defendant contends that the Indictment is insufficient to charge him as a principal in the honest-services fraud scheme on two grounds. He first argues that the Indictment fails to

4

allege that he entered into a *quid pro quo* agreement to accept a bribe or kickback in exchange for his performance of an official act.

Here, the Indictment adequately alleges that the defendant entered a *quid pro quo* arrangement with Abou Raad. It alleges that he was paid to locate potential buyers of the fraudulently obtained license in the course of his work as an inspector. Specifically, the Indictment alleges that, on one occasion, after the defendant had provided Abou Raad the name of a potential buyer, conducted an inspection of the service station, and the fraudulent transaction had been completed, he asked Abou Raad "how much you got for me?" Indictment ¶¶ 15–25.

The defendant also argues that the Indictment fails to allege that he performed an "official act" as a matter of law. The defendant cites several cases standing for the proposition that, for purposes of 18 U.S.C. § 201, the term "official act" should be construed narrowly to cover only discretionary action on questions or matters the public official is empowered to address in his role as a government officer. See, e.g., Valdes v. United States, 475 F.3d 1319, 1323–24 (D.C. Cir. 2007). Unlike the honest-services fraud statute, however, § 201 expressly defines "official act." The decisions upon which the defendant relies were decided on the basis of the statutory language found in § 201. But, the definitions contained in § 201 have been held to be inapplicable to other federal bribery statutes, such as §§ 1341, 1346, and 1951, which have different structures and requirements. United States v. Ganim, 510 F.3d 134, 146 (2d Cir. 2007) (holding that the § 201 requirement that there be a connection between the thing of value conferred and a *specific* "official act" is inapplicable to other federal bribery statutes). Section 201 carefully limits the scope of the term "official act" because its gratuity provisions punish the conferral of benefits merely "for or because of" an official act, a concern inapplicable to other

5

federal bribery provisions because they contain a *quid pro quo* requirement. Id. at 146–47; see Valdes, 475 F.3d at 1327 (comparing the bribery and gratuity provisions of § 201).

In contrast, the term "official act" is typically construed more broadly with respect to other federal bribery statutes. See United States v. Urciuoli, 513 F.3d 290, 294 (1st Cir. 2008) (citing United States v. Potter, 463 F.3d 9, 18 (1st Cir. 2006)) (explaining that § 1346 covers both formal official action, such as votes, as well as informal action on legislation); United States v. Rivera-Rangel, 396 F.3d 476, 484 (1st Cir. 2005) (construing § 1951 and holding that governor's aide who made phone calls from her government office and in her official capacity asking politicians to meet with a third party and help him engaged in official acts). There is, of course, a limit to the types of official action that have an effect on the public's right to honest services. See United States v. Czubinski, 106 F.3d 1069, 1077 (1st Cir. 1997) (harboring doubts about whether violation of workplace regulations violated honest-services fraud statute, but recognizing that such doubts could be overcome by sufficient evidence of scheme to defraud).

Here, the Indictment alleges that the defendant participated in the scheme in two ways: (1) identifying potential buyers and referring them to Abou Raad, and (2) conducting the site inspections necessary to ensure the service stations met the inspection program's requirements. With respect to the identification of buyers, the Indictment alleges that the defendant found and referred potential buyers using connections he developed in his role as a public official.

I am satisfied that the Indictment sufficiently alleges that the defendant undertook official acts. The allegations bring the defendant's conduct within the honest-services fraud statute's core concern with bribery by stating that he entered into an arrangement to accept cash payments in exchange for performing his official duties in a corrupt manner. Although there may be factual

disputes about whether the defendant's actions qualify as official acts, the Indictment adequately notifies him of the charges against him. Any factual disputes are appropriately resolved at trial.

    C.    <u>Aiding and Abetting</u>

In addition to charging the defendant as a principal, Counts I through XVI also charge him with aiding and abetting the charged mail fraud schemes. To be guilty of aiding and abetting a crime, a defendant "must 'in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about, . . . seek by his action to make it succeed.'" <u>Urciuoli</u>, 513 F.3d at 299 (alterations in original) (quoting <u>United States v. Peoni</u>, 100 F.2d 401, 402 (2d Cir. 1938)). Put another way, the defendant must have "willfully participated" in the venture. <u>United States v. Martin</u>, 228 F.3d 1, 18 (1st Cir. 2000). In the case of a fraudulent scheme or artifice, although it is not necessary for a particular defendant to know every facet of the scheme, he must know enough to establish scienter. <u>Urciuoli</u>, 513 F.3d at 300. The government must show not only that the individual participated in the fraudulent scheme, but also that he knew of its fraudulent nature. <u>Id.</u>

The Indictment's allegations are more than sufficient. They necessarily imply that he was aware of the fraudulent nature of the arrangement. There are numerous allegations that the defendant participated knowingly and willfully in the scheme. As noted above, the Indictment specifically alleges that after one fraudulent transaction was completed, the defendant asked Abou Raad how much money he had for him. The plain implication of these allegations is that the defendant understood that the licenses were not being issued to the buying stations as part of any bona fide merger or change in ownership.

### D. Hobbs Act Extortion

Count XVII charges the defendant with conspiring to commit extortion, in violation of 18 U.S.C. § 1951 (the Hobbs Act). Under the Hobbs Act, it is a crime to obstruct, delay, or affect commerce by means of extortion. 18 U.S.C. § 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2). The government can prove extortion under color of official right by showing that a public official "obtained a payment to which he was not entitled, knowing that the payment was made *in return for* official acts." Evans v. United States, 504 U.S. 255, 268 (1992) (emphasis added).

The Indictment alleges that the defendant conspired to commit extortion both under color of official right *and* through the use of actual and threatened fear of economic harm. The defendant argues that the Indictment is insufficient with respect to the Hobbs Act charge for the same reasons that it is insufficient with respect to the honest-services fraud charges. The defendant's *quid pro quo* and official-act arguments do not, however, warrant dismissal of the Hobbs Act charge any more than they warrant dismissal of the honest-services fraud charges. And, as the government points out, the defendant has not even addressed the Indictment's fear-of-economic-harm theory. There is no basis to dismiss Count XVII.

### III. Conclusion

For the foregoing reasons, the defendant's Amended Motion to Dismiss (dkt. no. 37) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge