UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 13-10194-GAO
                              )
DAVID P. GAW,                 )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE



JURY TRIAL - DAY TWO



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, July 15, 2014
9:05 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: S. Theodore Merritt and Alexander H. Berlin,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        1 Courthouse Way
         Suite 9200
5        Boston, Massachusetts  02210
         On Behalf of the Government
6
         COSGROVE, EISENBERG & KILEY, PC
7        By: William J. Cintolo, Esq.
         One International Place
8        Suite 1820
         Boston, Massachusetts  02110
9        On Behalf of the Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                    Direct  Cross  Redirect  Recross
     WITNESSES FOR THE
3      GOVERNMENT:

4    CRAIG RING

5        By Mr. Merritt          5              34
         By Mr. Cintolo               23               36
6
     MIKE DEVANEY
7
         By Mr. Berlin          40
8        By Mr. Cintolo               68

9    MARK TOULOUSE

10       By Mr. Merritt       83, 119

11   FRANK PIGNATARE

12       By Mr. Berlin          90
         By Mr. Cintolo               97
13
     DAVID LEVINE
14
         By Mr. Merritt         98
15       By Mr. Cintolo              113

16
                          E X H I B I T S
17
     GOVERNMENT'S
18     EXHIBIT     DESCRIPTION              FOR ID    RECEIVED

19   1          RMV website snapshot                    8

20   3          Consensual recordings of Abou Raad and Roger    13

21   3A         4/17/12 conversation between Abou Raad and Roger    13

22   3B         6/6/12 conversation between Abou Raad and Roger    13

23   4          Excerpt of 540 CMR 4.0                  45

24   12A-F      Stoneham Autoworks RMV file             53

25

E X H I B I T S (Cont'd)

GOVERNMENT'S
EXHIBIT          DESCRIPTION                            FOR ID        RECEIVED

| GOVERNMENT'S EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|
| 10-10A | Libby Corp. RMV file | | 63 |
| 5 | RMV printouts of inspection stations by volume | | 68 |
| 6A-U | Intercepted calls | | 85 |
| 11 | Pignatare letter to RMV | | 93 |
| 7 | Levine-Raad escrow agreement | | 105 |
| 8 | Levine checks | | 108 |
| 9 | Receipt for application | | 112 |

1                    P R O C E E D I N G S

2           THE CLERK:  All rise for the Court and the jury.

3           (The Court and jury enter the courtroom at 9:05 a.m.)

4           THE CLERK:  Be seated.

5           THE COURT:  Good morning, jurors.

6           THE JURORS:  Good morning.

7           THE COURT:  Those of you in the back row may want to

8    get your monitors ready.  I'm sure we'll have use of them today

9    at some point.

10          All right.  Mr. Merritt, your first witness, please.

11          MR. MERRITT:  Yes, your Honor.  The United States

12   calls Special Agent Craig Ring.

13                    CRAIG RING, duly sworn

14          THE CLERK:  Have a seat.  State your name and spell

15   your last name for the record.

16          THE WITNESS:  It's Craig Ring, R-I-N-G.

17          THE CLERK:  Thank you.

18                    DIRECT EXAMINATION

19   BY MR. MERRITT:

20   Q.   Where do you work?

21   A.   At the FBI.

22   Q.   And what's your position there?

23   A.   Special agent.

24   Q.   And how long have you worked for the FBI?

25   A.   24 years.

1   Q.   And in the course of your career, what various units have
2   you been in?
3   A.   I've spent half of my career working white-collar crime
4   and the other half working terrorism.
5   Q.   And did you become involved in an investigation involving
6   the Massachusetts vehicle inspection program?
7   A.   Yes, I did.
8   Q.   And about when did you become involved?
9   A.   Approximately April 2012.
10  Q.   And what precipitated the investigations?
11  A.   I met with an individual who owned a gas station who
12  described the scheme to me.
13  Q.   And what was his first name?
14  A.   Roger.
15  Q.   And what was the general nature of the information he
16  provided to you?
17  A.   In general, if you were an individual who wanted to obtain
18  an inspection license, the list was too long, and if you went
19  to Simon Abou Raad, paid $65,000, you could get a machine.
20  Q.   And did he indicate whether or not there was a belief that
21  there were RMV officials involved?
22  A.   Yes.
23  Q.   Now, did you learn who Simon Abou Raad was?
24  A.   Yes.
25  Q.   Who was he and what business was he in?

1    A.    Simon Abou Raad, he's in the gas station business.  He

2    owned two stations:  one in Tewksbury, Massachusetts, and the

3    other in Tyngsboro.

4    Q.    And with respect to the information about the RMV, did you

5    take any steps to confirm that information with respect to the

6    waiting list?

7    A.    Yes, I did.

8    Q.    What did you do?

9    A.    Accessed the RMV website, and also called the RMV to

10   verify the information.

11          MR. MERRITT:  May I approach the witness, your Honor?

12          THE COURT:  All right.

13   BY MR. MERRITT:

14   Q.    I'm showing you what's marked as Exhibit 1, Government

15   Exhibit 1.  Do you know what that is?

16   A.    Yes, I do.

17   Q.    What is that?

18   A.    This is a printout from the Massachusetts vehicle check

19   website dated April 10, 2012.

20   Q.    And is that a screen shot that you took when you looked at

21   it?

22   A.    That's correct.

23          MR. MERRITT:  Your Honor, I move in Government Exhibit

24   1.

25          MR. CINTOLO:  No objection, your Honor.

1          THE COURT:  All right.

2          (Government Exhibit No. 1 received into evidence.)

3          MR. MERRITT:  If we could have that displayed, your

4    Honor.  And if we could hone in on that part there.

5    BY MR. MERRITT:

6    Q.   Could you just read that, Agent Ring?

7    A.   Yes.  "For more information about inspections and

8    licensing requirements, please see the inspection station rules

9    and regulations posted at http://www.mass.gov or call the

10   station support hotline at (877) 834-4677.  If you would like

11   to be considered for a fleet, mobile or heavy-duty public

12   inspection station, please email Mark.LaFrance@state.ma.us.

13   Please include the following information."

14   Q.   Now, did you call that hotline?

15   A.   Yes, I did.

16   Q.   And what information were you given?

17   A.   The information I was given is that there was a waiting

18   list, it was very long, and if you wanted to apply, you could

19   submit an application or email Mr. LaFrance at that email

20   address to get additional information.

21   Q.   All right.

22          MR. MERRITT:  All right.  If we could just scroll down

23   to...

24   Q.   If you would read that, Agent Ring.

25   A.   "Please note:  The RMV does not anticipate utilizing

1   stations on the waiting list for public light-duty inspection

2   station except under extenuating circumstances, such as areas

3   of the Commonwealth that are deemed to be underserved.  If you

4   have previously placed your name on the waiting list for a

5   Class A or Class B station license, we will contact you if a

6   license becomes available."

7   Q.   Now, did you investigate who Mark LaFrance was with

8   respect to this program?

9   A.   Yes.

10  Q.   And who was he?

11  A.   He was the program manager for Vehicle and Safety at the

12  Massachusetts Registry of Motor Vehicles at the time.

13  Q.   Now, was your role as one of the case agents for this

14  investigation?

15  A.   That's correct.

16  Q.   And could you just explain to the jury what you did as a

17  co-case agent?

18  A.   Co-case agent with Special Agent Mark Toulouse,

19  essentially we divided the work between ourselves and decided

20  how to proceed with the case.

21  Q.   And what kinds of investigative activities did you

22  undertake?

23  A.   We met with the cooperator, we performed consensual

24  recordings, we conducted surveillances, we did records checks,

25  we requested records through subpoena and various other

1    investigative techniques.

2    Q.   Now, you mentioned the cooperator.  Did you enlist Roger's

3    cooperation in the FBI investigation?

4    A.   Yes, we did.

5    Q.   And what did you ask him to do?

6    A.   To make consensual recordings.

7    Q.   And what is a consensual recording?

8    A.   A consensual recording, we provide recording equipment, we

9    give him a device, and under our supervision and direction he

10   goes to meet with an individual who we want to make a recording

11   with.

12   Q.   And when it's called "consensual," whose consent is being

13   given?

14   A.   Roger's consent is being given to the FBI to record the

15   conversation between himself and the party that we want to

16   record.

17   Q.   Now, did you meet with Roger on April 17th, 2012?

18   A.   Yes.

19   Q.   And for what purpose?

20   A.   For the purpose of making a consensual recording with

21   Simon Abou Raad.

22   Q.   And were you with anyone else?

23   A.   Yes.

24   Q.   Who was that?

25   A.   Special Agent Kevin Sheehan.

1   Q.   And did you provide Roger with a recording device?

2   A.   Yes, we did.

3   Q.   And was this a device that the FBI has used in other

4   investigations?

5   A.   That's correct.

6   Q.   And how did you attach it or how was that given to Roger?

7   A.   It's a small device.  We just had him put it in his

8   pocket.  It's a digital recorder.

9   Q.   And did you activate the recorder?

10  A.   Yes, I did.

11  Q.   Where did Roger go?

12  A.   He went to Simon Abou Raad's business, Simon's Service

13  Center in Tyngsboro, Massachusetts.

14  Q.   And did you follow him there?

15  A.   Yes.

16  Q.   And did you make observations at the station?

17  A.   Yes, we did.

18  Q.   And who did you see?

19  A.   We saw Roger entering the station, and maybe ten minutes

20  into the meeting, himself and Simon Abou Raad came outside,

21  talked outside for ten, 15 minutes, and then went back inside,

22  and then Roger departed.

23  Q.   And afterwards, did you retrieve the recorder?

24  A.   Yes, we did.

25  Q.   Was it running or stopped?

1    A.    It was running.

2    Q.    And did you stop it?

3    A.    Yes.

4    Q.    And what did you do with the tape after that?

5    A.    Well, it's a digital recording, so we downloaded it onto a

6    CD and collected it as evidence.

7              MR. MERRITT:  May I approach, your Honor?

8              THE COURT:  You may.

9    BY MR. MERRITT:

10   Q.    I've handed you what's marked as Government Exhibit 3.

11   What is that?

12   A.    This is a CD containing two recordings.

13   Q.    3A and 3B?

14   A.    That's correct.

15   Q.    And how was this particular disk made?

16   A.    This is a copy of the original recording of the

17   consensuals Roger had with Simon Abou Raad.

18   Q.    And do you recognize the voices that are on Exhibit 3?

19   A.    Yes.

20   Q.    Whose are they?

21   A.    They're Simon Abou Raad's, Roger's, and David Gaw.

22   Q.    And Mr. Gaw's voice, in what form is that on the

23   recording?

24   A.    It's a telephone message.  So Simon Abou Raad played a

25   telephone message for Roger during the meeting.

1   Q.   And how do you recognize the defendant's voice?

2   A.   I've met him and have spoken with him personally, and I

3   also listened to numerous calls that he had with Simon

4   Abou Raad while we had a Title III going.

5   Q.   And when you were surveilling the conversation or the

6   recording conversation that Mr. -- Roger was having with Simon

7   Abou Raad, did you make any observations?

8   A.   Yes.

9   Q.   What was that?

10  A.   We observed Simon Abou Raad outside with Roger during the

11  conversation.

12  Q.   At any point did you see him do anything with his phone?

13  A.   Yes, we did.  We saw him take out his phone and play

14  the -- what appeared to be -- played something for Roger.

15          MR. MERRITT:  Your Honor, I'd move in Exhibit 3,

16  containing 3A and 3B.

17          MR. CINTOLO:  No objection.

18          THE COURT:  All right.

19          (Government Exhibit Nos. 3, 3A and 3B received into

20  evidence.)

21  BY MR. MERRITT:

22  Q.   I've also placed before you a transcript book.  Do you see

23  that?

24  A.   Yes, I do.

25  Q.   And focusing on the tabs that are marked 3A and 3B, these

```
 1    transcripts, how were they prepared?
 2    A.   They're prepared by FBI linguists.
 3    Q.   What do you mean by an FBI linguist?
 4    A.   So it's a language specialist at the FBI because there's
 5    Arabic and English on the recordings.
 6    Q.   And is Exhibit 3A and 3B transcript, TR, an accurate
 7    depiction of the conversation?
 8    A.   Yes, I believe so.
 9              MR. MERRITT:  Your Honor, at this time I would ask to
10    pass out the transcripts and --
11              THE COURT:  All right.  Are you going to play the
12    audio?
13              MR. MERRITT:  Yes, your Honor.
14              THE COURT:  Okay.
15              Jurors, it's not unusual for recordings to be played
16    in cases such as this.  The recording itself, the audio, is the
17    evidence.  As an aid to your understanding of it, because
18    sometimes there's varying degrees of quality to the recording,
19    counsel often prepare and distribute to you what are intended
20    to be accurate transcripts of what the audio holds.
21              The transcripts are technically not the evidence; it's
22    a best effort to give you an aid to understanding it.  So your
23    primary focus should be on listening to the tapes, and if the
24    text helps you follow and understand it, all to the good.
25              I'm informed that some portions of these are
```

1   translations of the audio where the audio was actually in a

2   non-English language, in this case Arabic.  That's indicated,

3   I'm told, by the transcript -- by the translated segment being

4   rendered in italics as distinguished from the rest of the text.

5          And actually, with respect to the translation, the

6   text is the evidence because you're not able to -- maybe you

7   are, but most people would not be able to understand the

8   original Arabic.  So you may take the italicized portions of

9   the text as the actual evidence.

10  BY MR. MERRITT:

11  Q.   Now, the first call -- or excuse me.  The first

12  conversation we're going to hear, that was on April 17, 2012?

13  A.   That's correct.

14  Q.   And this is the meeting that you described at Simon's

15  service station?

16  A.   Simon's Service Center.

17          (Audiotape played.)

18  Q.   Now, Special Agent Ring, just jumping ahead, besides the

19  consensual recordings, were later investigative steps taken?

20  A.   Yes.

21  Q.   And what did they include?

22  A.   We applied for and obtained permission to go up on a Title

23  III on Simon Abou Raad's mobile phone.

24  Q.   And briefly, what is a Title III?

25  A.   Title III is a -- we write an affidavit, and it's

1    permission from the court to monitor an individual's phone.

2    And in this case we also obtained permission to listen to his

3    telephone messages.

4    Q.   And from what period of time did the FBI listen to Simon

5    Abou Raad's cell phone?

6    A.   From December 12th, 2012, to March 11, 2013.

7    Q.   And have you listened to all the pertinent calls?

8    A.   Yes, I have.

9    Q.   And what types of callers were on the phone?

10   A.   He spoke to Mr. LaFrance, Mr. Gaw, other station owners,

11   and then there's a lot of routine business that was on the

12   Title III also.

13   Q.   And besides listening to the calls, did you learn about

14   the process for vehicle inspection licenses?

15   A.   Yes.

16   Q.   And how did you do that?

17   A.   Through listening to the Title III, through interviews

18   with registry officials, and through interviews of gas station

19   owners who bought machines from Simon Abou Raad.

20   Q.   Now, let me ask you about a couple of things that we just

21   heard on a call.  Do you know the reference in the beginning

22   where there's talk about doing stickers?

23   A.   Yes.

24   Q.   What does "doing stickers" mean?

25   A.   Stickers means --

1              MR. CINTOLO:  Objection, your Honor.

2              THE COURT:  Sustained.

3              MR. MERRITT:  May we approach, your Honor?

4              THE COURT:  All right.

5              (Discussion at sidebar and out of the hearing of the

6      jury:)

7              MR. MERRITT:  Your Honor, I thought I had just laid a

8      pretty good foundation as to why Special Agent Ring could give

9      a lay opinion based upon his experience that would be helpful

10     to the jury.  He's listened to, you know, numerous calls, he's

11     interviewed RMV inspectors, and to explain some of the things

12     that are on the tape I think is admissible under the rule.

13             THE COURT:  I think the problem I had with it was

14     explaining the tape as opposed to explaining --

15             MR. CINTOLO:  The process.

16             THE COURT:  Right.

17             MR. MERRITT:  I was just asking him what the

18     sticker --

19             THE COURT:  Right.  That's okay.  But it was an

20     interpretation of words used by one of the people on the tape

21     which was the problem I had; not his ability to talk about

22     stickers.

23             MR. MERRITT:  Okay.

24             (In open court:)

25     BY MR. MERRITT:

1   Q.    Based on your investigation, do you know what "doing

2   stickers" means?

3   A.    Yes, I do.

4   Q.    What is that?

5   A.    It refers to performing vehicle inspections.

6   Q.    And when on the tape there is a voicemail played, is that

7   what you were referring to that you actually observed?

8   A.    Yes.

9   Q.    And on the tape on Page 9 in the transcript, there's a

10  reference that says -- Simon Abou Raad says, "But how do I do

11  machines if they don't tell me?  This guy," so-and-so, "he's in

12  trouble.  Work him."  Do you know who he's referring to?

13          MR. CINTOLO:  Objection, your Honor.

14          THE COURT:  Sustained.

15  BY MR. MERRITT:

16  Q.    Did you ask Roger to make any additional phone calls with

17  Simon Abou Raad?

18  A.    Yes.

19  Q.    And was one of these on June 6, 2012?

20  A.    Yes, it was.

21  Q.    Where did you meet with Roger?

22  A.    We met with Roger at his business.

23  Q.    And was a call placed to Simon Abou Raad?

24  A.    Yes, it was.

25  Q.    And were you present when Roger made the telephone call?

1    A.    Yes, myself and Agent Toulouse.

2    Q.    And did you recognize the voices?

3    A.    Yes.

4    Q.    And whose was that?

5    A.    Roger and Simon Abou Raad.

6    Q.    And that was on June 6, 2012?

7    A.    That's correct.

8          MR. MERRITT:  Your Honor, I think I'd like to ask that

9    we play Exhibit 3B --

10          THE COURT:  Okay.

11          MR. MERRITT:  -- which is also in the transcript book

12    as well.

13          (Audio recording played.)

14    BY MR. MERRITT:

15    Q.   Now, was it part of the investigative plan that

16    Roger -- you wanted Roger to get a -- buy a license from Simon

17    Abou Raad?

18    A.    Yes.

19    Q.    And were you able to do that in this time frame?

20    A.    No.

21    Q.    And why was that?

22    A.    We couldn't logistically make it happen.

23    Q.    Was that something to do with getting the money from the

24    FBI?

25    A.    That was part of it, yes.  And then having a suitable

1    location was another thing.

2    Q.   Now, did Roger also record any conversations with the

3    defendant, David Gaw?

4    A.   Yes, he did.

5    Q.   And did the defendant ever ask him for any money, any of

6    them?

7    A.   No.

8    Q.   Now, I think you mentioned that based on the consensuals

9    and other investigative steps, that you applied for a Title III

10   wiretap.  I just want to ask you a little bit more about that.

11   What are the procedural steps that you went through?

12   A.   First we had to write the affidavit.  Once we completed

13   the affidavit, we submitted it to the U.S. Attorney's Office,

14   who then coordinated with the Department of Justice.

15   Q.   And when you say "the affidavit," what does the affidavit

16   show?

17   A.   The affidavit is a collection -- we write out all the

18   evidence that we've collected which would support the fact that

19   Simon Abou Raad was using his phone for criminal activity and

20   we couldn't obtain evidence in any other way.

21   Q.   And then you said it was submitted to the Department of

22   Justice as well?

23   A.   That's correct.

24   Q.   That's an internal --

25   A.   Internal procedure; yes, sir.

1    Q.   And after that, was an application made to a United States

2    district judge?

3    A.   Yes.

4    Q.   And was it granted, the order?

5    A.   Yes, it was.

6    Q.   And how long did the order last?

7    A.   Thirty days.

8    Q.   And was there a renewal of that?

9    A.   Yes; two of them.

10   Q.   So about a total of 90 days?

11   A.   Correct.

12   Q.   Were there any other restrictions placed on the ability to

13   monitor and record the calls?

14   A.   Yes, there were.

15   Q.   And what's that?

16   A.   We were required to minimize the calls.

17   Q.   Can you just tell the jury briefly what "minimize" means?

18   A.   "Minimize" means we have to perform live monitoring, and

19   we're only allowed to listen to pertinent calls.  So if we deem

20   something non-pertinent, we had to stop monitoring for a time

21   period.

22   Q.   And in terms of actually implementing the wiretap order,

23   how did you go about doing that?

24   A.   There's a special room that's set up in the FBI office for

25   it.  Only the people who are authorized to do the monitoring

1  have access, and everyone's required to be briefed and

2  understand the minimization rules.

3  Q.  And in terms of dealing with the phone company, is there

4  something you do?

5  A.  Yes.  Once the application and the order are approved and

6  the order is submitted to the phone company and once the phone

7  company receives the order, they give us access to a circuit

8  which allows us to monitor.

9  Q.  Now, you said then the calls were then monitored and

10 recorded if they were pertinent?

11 A.  That's correct.

12 Q.  And actually, how is that done?

13 A.  So when a call comes in, it rings.  You hear it ringing,

14 you see the phone numbers.  Over time you begin to recognize

15 calls that are going to be automatically non-pertinent.  And

16 then if we weren't able to determine whether it was pertinent

17 or non-pertinent, we'd listen until we could make that

18 determination.  No longer than two minutes, though.

19 Q.  And with each call, then, how was that --

20 A.  So each call is given a number so it can be referred to.

21 They're logged and preserved.

22 Q.  And do you -- again, what time period was Abou Raad's cell

23 phone monitored?

24 A.  From December 12, 2012, to March 11, 2013.

25 Q.  And were any calls between Mark LaFrance and Simon

1    Abou Raad monitored and recorded?

2    A.    Yes.

3    Q.    And any calls between the defendant, David Gaw, and Simon

4    Abou Raad monitored and recorded?

5    A.    Yes.

6             MR. MERRITT:   No further questions, your Honor.

7                         CROSS-EXAMINATION

8    BY MR. CINTOLO:

9    Q.    Agent Ring, you were asked about two consensual calls

10   during the course of your direct examination, correct?

11   A.    One was an in-person meeting and the second one was a

12   call.

13   Q.    Both of them were consensual calls?

14   A.    One was -- we actually -- he went there in person with a

15   recording device.  The second one was a call.

16   Q.    Consensual recordings?

17   A.    Yes, sir.

18   Q.    Okay.  Are those the only consensual recordings that you

19   caused to be made?

20   A.    No.

21   Q.    There were other calls, were there not, and other

22   in-person discussions that were recorded?

23   A.    Yes, there were.

24   Q.    And, in fact, the first one that was played was April

25   17th, correct?

1    A.    Correct.

2    Q.    And during the course of your actions as a case agent, did

3    you have occasion to listen to or see the transcripts of all of

4    the consensual recordings?

5    A.    Yes.

6    Q.    A case agent means that you are, in essence, in control

7    along with your fellow case agent, Mr. -- Agent Toulouse, and

8    you can ask other people or other individuals in the department

9    to help you out, correct?

10   A.    Other agents?

11   Q.    Yes.

12   A.    We can ask for help, yes.

13   Q.    And everything basically runs through you?

14   A.    Yes.

15   Q.    So when the consensual recordings were made, other than

16   the two that were played in court, did you cause transcripts to

17   be made of the others, other consensual recordings?

18   A.    Yes, sir.

19   Q.    And did you listen to those recordings before the

20   transcripts were made?

21   A.    Yes.

22   Q.    Did you then try to compare what you heard with the

23   transcript of the ones that weren't played?

24   A.    I didn't do that personally.

25   Q.    You didn't do that personally?  Did another case agent do

1  that or another individual do that and report to you?

2  A.    Another individual in the FBI did, yes.

3  Q.    Yeah.  And did you listen to the call on April 4th between

4  Roger and Simon Abou Raad?

5  A.    April 4th?

6  Q.    April 14th.

7  A.    April 14th?  Yes, I did.

8  Q.    And that was a call in -- that was a recording in which

9  Roger is, in essence, working for the department, or working

10  for the agents as a cooperating individual, correct?

11  A.    Correct.

12  Q.    And he is sent in to talk to Roger, correct -- to Simon,

13  correct?

14  A.    Correct.

15  Q.    And the purpose of him going there is to attempt to get

16  incriminating statements from Simon, right?

17  A.    Correct.

18  Q.    And to learn anything else that he can about other

19  individuals who might be involved?

20  A.    Yes.

21  Q.    And you tell him that's the reason you want him to go in

22  there, correct?

23  A.    "Him," Roger?

24  Q.    Yes.

25  A.    Yes.

1    Q.    Now, on the 14th of April --

2          MR. CINTOLO:  May I have a moment, your Honor?

3    Q.    On the 14th of April, during the course of that call

4    did -- course of that conversation did Roger have a discussion

5    with Simon with regard to the involvement of Gaw in this

6    matter?

7    A.    I don't remember specifically.

8    Q.    Now, in this case, besides the final transcripts there

9    were preliminary transcripts that were made, correct?

10   A.    Correct.

11   Q.    And during the course of those preliminary -- do you know

12   whether or not a preliminary transcript of the 14th was made?

13   A.    I think it was, yes.

14   Q.    And have you had occasion to read that?

15   A.    Yes.

16   Q.    Do you have it with you?

17   A.    I'm not sure.

18   Q.    Can you check?

19          (Pause.)

20   A.    I'm not seeing it in this book, sir.

21   Q.    You're not seeing it in the book?

22   A.    No, sir.

23   Q.    Do you recall when you were listening to that conversation

24   that Roger said to Simon, speaking about Dave Gaw, he said,

25   "No, he didn't tell me anything.  No."

1          Dave clears his throat.

2          "Dave told me I don't want to -- I'm not involved.

3          "I'm, like, whatever.  I don't care who's involved.

4          "He's like, you know.

5          "And then I asked him, 'How?  How do you get the license?'

6     And I told him, 'I don't want to know.  I really don't care as

7     long as I'" -- and then the conversation ends on that

8     particular subject.

9          Do you recall that?

10    A.   I do.

11    Q.   Okay.  And so what -- is it fair to say that those

12    words -- the words were used that Gaw told Roger that he had

13    nothing to do with this?

14    A.   I think the words speak for themselves, sir.

15    Q.   All right.  Correct.  Thank you.

16          And during the course of that same conversation -- that's

17    a call you didn't play, right, here?

18    A.   Not yet.

19    Q.   Is it in the book, by the way, that was given to the jury?

20    Is that transcript in the book that was given to the jury?

21    A.   I don't believe so.

22    Q.   Okay.  And do you recall further on in that same

23    conversation when they are discussing David Gaw and Roger asks,

24    "With David, I don't want to know."  And then Simon says,

25    "Fuck.  Fuck him.  If you have a bay 10 feet, the door --

1     "Yeah.

2     " -- by 30 feet --

3     "Yeah.

4     "That's all I need from you."

5        Now, the 10 feet by 30 feet, during the course of your

6     investigation of this case, when you were trying to find out

7     what the procedure was for obtaining licenses, did you

8     determine -- or did you find out how large the bay has to be?

9     A.   Exactly what you said, 10 by 30.

10    Q.   Okay.  And if the bay were 10 by 30, that's really all the

11    individual who was seeking the license needed, correct?

12    A.   Well, there are a number of other things, but for a Class

13    A license, my understanding is that the bay needed to be 10

14    feet by 30 feet.

15    Q.   And you learned from your investigation while you were

16    doing your investigation of this matter -- you learned that the

17    investigation that the inspectors, like Mr. Gaw did, was to go

18    out there and simply certify or verify that the bay was 10 feet

19    by 30.

20    A.   I think they did a number of inspections.  The first one

21    was to -- when the individual applied for a license, was to

22    verify that they had adequate space in order to obtain a

23    machine.

24    Q.   Okay.  And we'll get to the others.  But that's what the

25    inspector does.  It's basically -- all he does, in that first

1    thing, he measures:  10 feet, 30 feet, correct?

2    A.    I think there are a number of other things.  He has a

3    checklist.  I can't recall the individual items on the

4    checklist, but I do recall the 10 by 30.

5    Q.    Okay.  And during the course of your investigation into

6    this particular matter, did you find any situations wherein

7    Mr. Gaw kind of fudged on the 10 by 30 that he -- it wasn't 10

8    by 30 and he claimed it was and certified it anyway?

9    A.    No.

10   Q.    Okay.  In fact, every time he went out there and looked,

11   if he certified that it was 10 by 30, it was 10 by 30, correct?

12   A.    To the best of my knowledge, yes.

13   Q.    During the course of your investigation, did you determine

14   how many licenses were transferred pursuant to the merger

15   procedure during the five years preceding March of 2013?

16   A.    No.

17   Q.    Did you have occasion to speak with anybody who indicated

18   to you that approximately 50 to 60 licenses were transferred

19   during that period?

20        MR. MERRITT:  Objection, your Honor.

21        THE COURT:  Sustained.

22   BY MR. CINTOLO:

23   Q.    Do you know how many licenses were transferred during that

24   time?

25   A.    No.

1   Q.   Okay.  When Mr. Raad tells Roger that in the last five

2   years he has sold 65 licenses, were you able to verify whether

3   that was a truthful statement?

4   A.   What time period are you talking about?

5   Q.   In the transcript, the one you played, he said, "I've

6   sold, over the last five years, 65 of these"?

7   A.   In 2008, I believe, the law changed.  And when they put a

8   cap on -- Mr. Abou Raad was in the business of buying and

9   selling the old equipment for many years before they changed

10  the rule.  So I'm not sure how many he did before the rule

11  changed and they capped the machines at 1600 and how many he

12  did after that time period.

13  Q.   2008, 2009, 2010, 2011, 2012.  Five years.  So is it fair

14  to say that the five years that's being referred to in that

15  conversation is post-change of the procedure?

16  A.   I'm not sure.

17         MR. MERRITT:  Objection, your Honor.

18         THE COURT:  Overruled.

19         You may answer it if you can.

20         THE WITNESS:  I'm not sure about the 2008 date then,

21  sir.

22  BY MR. CINTOLO:

23  Q.   I'm sorry?

24  A.   I'm not certain about the 2008 -- when the law changed.

25  There was a time period where they capped the licenses, they

1    went to all the station owners, they changed the rules of the

2    program, and I can't remember the date that all that changed.

3    But Mr. Raad had been in the business of buying and selling

4    machines and licenses for many years.

5    Q.    Okay.  So you didn't verify -- attempt to verify, as you

6    were the case agent, to see whether or not the statements that

7    Mr. Raad was making to Roger were true or not true?

8    A.    Well, we attempted to verify as much information as we

9    could.

10   Q.    I understand that.  Did you attempt to verify whether or

11   not the statements that Mr. Raad was making to Roger were true

12   or not?

13   A.    That particular statement, no.

14   Q.    Okay.  Raad was a liar, wasn't he?

15   A.    I have no knowledge of him lying unless you want to give a

16   specific example.

17   Q.    Okay.  Do you know whether or not he would fabricate and

18   puff?  Do you know what "puff" means, when he was trying to

19   sell something?

20   A.    Exaggerate.

21   Q.    Exactly.  Would he do that?

22   A.    Would Mr. Raad?

23   Q.    Yes.

24   A.    Yes, he would.

25   Q.    And he would attempt to make himself maybe more important

1   than he really was?

2   A.   Yes, sir.

3   Q.   And by attempting to make himself more important than he

4   really was, he would indicate that he had relationships with

5   people and would make those relationships extremely close when

6   they might not have been that close?

7   A.   I believe he had close relationships with people.

8   Q.   I understand that.  Now, my question was:  Were there

9   occasions when he would make it appear as if he had a

10  relationship with somebody that was closer than it really was?

11  A.   I can't recall anything specifically.

12  Q.   Okay.

13          MR. CINTOLO:  Bear with me one moment, your Honor.

14          (Pause.)

15  Q.   During the course of one of my questions I asked you, "You

16  said the words speak for themselves," correct?

17  A.   Regarding the consensual?

18  Q.   Yes.

19  A.   Yes.

20  Q.   When the tape was played with regard to April

21  17th -- that's the one you just testified about?

22  A.   Correct.

23  Q.   And that's the one you have a transcript up there with it?

24  A.   I do.

25  Q.   I'm going to direct your attention to page 2,

1  approximately halfway down where it says "SAR," and he says,

2  "He...he fucking...look here."  Do you see that?

3  A.    Yes.

4  Q.    And that's where the conversation that's played -- the

5  message conversation that's played -- from Mr. Gaw?

6  A.    That's correct.

7  Q.    Okay.  And Mr. Gaw says -- "Plays a message that says:

8  'Simon, this is Dave.  You're making me look bad.  This kid

9  wants to buy the equipment and, uh, you haven't called him

10  back.'"

11        Do you see that?

12  A.    Yes, I do.

13  Q.    Now, the words speak for themselves, do they not?

14  A.    Yes, they do.

15  Q.    And the word is "equipment"?

16  A.    Yes.

17  Q.    Was there any prohibition that you're aware of to sell

18  equipment?

19  A.    No.

20  Q.    Is it fair to say that during the course of that April

21  17th conversation that Mr. Raad is telling Roger, "I'm the

22  man," meaning Simon.  "I'm the man.  All you have to do is go

23  through me.  Don't worry about anything else."

24        Is that a fair representation of what you think the

25  conversation is?

1    A.   Again, I think it speaks for itself, sir.

2    Q.   The words speak for themselves?

3    A.   Yes, they do.

4         MR. CINTOLO:  I have nothing further of this witness,

5    your Honor.

6         THE COURT:  Mr. Merritt?

7                    REDIRECT EXAMINATION

8    BY MR. MERRITT:

9    Q.   Just to clarify something, when you were asked about the

10   whole business about the 10-by-30 bay.

11   A.   Yes.

12   Q.   That was on the call on June 6th, right?

13   A.   That's correct.

14   Q.   And that's in the transcripts?  In the Exhibit 3B

15   transcript?

16   A.   Yes, sir.

17   Q.   So that was played for the jury?

18   A.   It was.

19   Q.   And when you were asked about whether or not based on

20   the -- listening to all the calls and the other parts of your

21   investigation whether Simon claimed to have relationships with

22   RMV officials that maybe he didn't -- do you remember those

23   questions?

24   A.   Yes.

25   Q.   Based on all those calls and your conversation, did he

1   have a close relationship with Mark LaFrance?

2           MR. CINTOLO:  Objection, your Honor.

3           THE COURT:  Overruled.

4           You may answer that.

5           THE WITNESS:  Yes.

6   BY MR. MERRITT:

7   Q.    And how do you know that?

8   A.    We listened to all the calls, we spoke with Mark LaFrance.

9   Q.    And did you also, based on that, determine whether or not

10  he had a close relationship with David Gaw?

11  A.    Yes.

12  Q.    And how did you know that?

13  A.    By listening to the calls.

14  Q.    And before you even listened to the calls, did you

15  trace -- or were you able to tell how many calls there were

16  between Mr. Gaw and Mr. Abou Raad during a certain period?

17  A.    Yes, we were.

18  Q.    How did you do that?

19  A.    We analyzed the phone records of Simon Abou Raad.  So

20  prior to obtaining the Title III, we obtained Mr. Abou Raad's

21  phone records through subpoena and performed a toll analysis to

22  see that Mr. Gaw was a high-volume caller to Mr. Abou Raad.

23  Q.    And you were also asked about -- reference to equipment.

24  During the course of listening to all these calls and such, did

25  you hear the term "machine" used a lot?

1  A.    Yes.

2  Q.    Did you hear the term "license" used a lot?

3  A.    Yes.

4  Q.    Were those used interchangeably by the callers?

5         MR. CINTOLO:  Objection, your Honor.

6         THE COURT:  Sustained.

7         MR. MERRITT:  No further questions, your Honor.

8         MR. CINTOLO:  Very briefly, your Honor.

9                         RECROSS-EXAMINATION

10 BY MR. CINTOLO:

11 Q.    Agent Ring, you indicated that you learned -- or you

12 determined that there was a close relationship between Gaw and

13 Raad from the recordings, correct?

14 A.    Correct.

15 Q.    Any other basis for that other than the recordings?

16 A.    The toll analysis that I spoke of also.

17 Q.    Okay.  Anything else other than the recordings or the toll

18 analysis?

19 A.    No.

20 Q.    During any time during the course of your investigation

21 when Raad was talking to one of the prospective sellers or

22 buyers, did you ever see Mr. Gaw present?

23 A.    No.

24 Q.    During the course of your investigation when Mr. Raad was

25 talking to either Mr. LaFrance or some other individual from

1    the motor vehicle registration, department of Massachusetts,

2    did you ever see Mr. Gaw present?

3    A.    No.

4    Q.    Did you ever see Gaw out to dinner with Mr. Raad?

5    A.    Not out to dinner.

6    Q.    Did you ever see them exchanging Christmas gifts?

7    A.    No.

8    Q.    Did you ever see them -- that they socialized, drove in

9    the same car?

10   A.    No.

11   Q.    And so although -- and your only basis for that is the

12   calls, correct?

13   A.    The calls and the toll analysis.

14   Q.    Do you know whether or not Mr. Raad was lying when he was

15   talking with Mr. Gaw?

16   A.    On what occasion?

17   Q.    On any occasion.

18   A.    No, I don't think so.

19   Q.    I'm not asking you if you think so.  Do you know -- you

20   told me you didn't verify all of the statements.  Do you know

21   whether or not when Raad is talking to Gaw, he's being polite

22   to him but really doesn't mean to be polite?

23            MR. MERRITT:  Objection, your Honor.

24            THE COURT:  Sustained.

25   BY MR. CINTOLO:

1  Q.   During the course of these calls, you heard the call where

2  Mr. Raad says, "You got to play the game.  You don't understand

3  these people."  Do you recall that conversation?

4       MR. MERRITT:  Objection, your Honor.

5       THE COURT:  Sustained.

6  BY MR. CINTOLO:

7  Q.   Just the calls, and the words speak for themselves, right?

8  Is that correct?  That's how you based your opinion?

9  A.   What opinion, sir?  What's your question?

10  Q.   We've been talking for the last few minutes about the

11  relationship -- your statement that the relationship between

12  Mr. Gaw and Mr. Raad is close although they never went to

13  dinner, they never drove in the same car, you never saw them

14  together, it's just the calls.  And your testimony is that the

15  words in the calls speak for themselves?

16  A.   Correct.

17  Q.   Okay.  So when Mr. Raad tells Roger, "Fuck him.  He has

18  nothing to do with this," is that the relationship you're

19  talking about?

20  A.   Which call?  When Mr. Raad tells...

21  Q.   You don't recall that call?  The 14th?

22  A.   Okay.  On April 14th?

23  Q.   Yeah.  The one you didn't play.

24       MR. MERRITT:  Your Honor, I'm going to object because

25  it was played.

1          THE COURT:  Sustained.  Well --

2   BY MR. CINTOLO:

3   Q.   Was the 14th --

4          MR. CINTOLO:  I'm sorry.  Then I missed it.  I'm

5   sorry.

6          MR. MERRITT:  You did miss it.

7   BY MR. CINTOLO:

8   Q.   Was the 14th played?  Was the conversation of the 14th

9   played?

10  A.   April 14th.

11  Q.   Yes.

12  A.   Yes, it was.  No, it was April 17th.  April 17th.

13  Q.   I'm sorry.  It wasn't played.  Was there a recording of

14  April 14th?

15  A.   Between who?

16  Q.   Was there a recording of April 14th between Roger and

17  Simon?

18  A.   Yes, there was.

19  Q.   Okay.  And that's the one that you said you made a

20  transcript of, correct?

21  A.   I didn't make it personally.

22  Q.   I understand that.  A transcript was made, correct?

23  A.   Correct.

24  Q.   It was checked by you, correct?

25  A.   Not personally.

1    Q.    Checked by you or somebody on your behalf checked it?

2    A.    At the FBI.

3    Q.    As you are the case agent, correct?

4    A.    I am one of the case agents.

5    Q.    Was that while that conversation played for this jury?

6    A.    No.

7            MR. CINTOLO:  Nothing further, your Honor.

8            THE COURT:  Thank you, Agent Ring.  You may step down.

9            (The witness is excused.)

10           MR. BERLIN:  Your Honor, the government calls Michael

11   Devaney.

12                   MICHAEL DEVANEY, duly sworn

13           THE CLERK:  State your name and spell your last name

14   for the record, please.

15           THE WITNESS:  Mike Devaney, D-E-V-A-N-E-Y.

16                       DIRECT EXAMINATION

17   BY MR. BERLIN:

18   Q.   Good morning, Mr. Devaney.  Would you tell the jury where

19   you work.

20   A.   Registry of Motor Vehicles, Quincy.

21           THE COURT:  Mr. Devaney, would you adjust the mic a

22   little bit so that you're speaking right into it?

23           THE WITNESS:  Registry of Motor Vehicles, Quincy.

24   BY MR. BERLIN:

25   Q.   And what is your current job title?

A.   I'm the assistant director of Vehicle Safety and
Compliance Services.

Q.   When did you start at the Registry of Motor Vehicles?

A.   2001.

Q.   And what was your job at that time?

A.   I was the office manager.

Q.   Have you held any other positions at the Registry of Motor
Vehicles?

A.   No, sir.

Q.   Now, what department do you work in within the Registry of
Motor Vehicles?

A.   Vehicle Safety and Compliance Services.

Q.   And what is the mission of Vehicle Safety and Compliance
Services?

A.   We oversee the vehicle inspection program and we oversee
the school bus inspection program.

Q.   And what are your duties and responsibilities as assistant
director of Vehicle Safety and Compliance Services?

A.   Mainly oversee the field staff, but whatever else the
director asks me to get involved in.  But my primary
responsibility is to oversee the field staff.

Q.   And when you say "field staff," what does that mean?

A.   So we have five regions, 40 field investigators that
over- -- that conduct audits on the vehicle inspection program
and conduct school bus inspections.

1   Q.   And the regions, how are those regions drawn up?

2   A.   So there's five regions:  Boston would be Region 1;

3   Lawrence would be Region 2; Worcester, Region 3; New Bedford,

4   Region 4; and Greenfield/Springfield, Region 5.

5   Q.   And when you say those cities, those are where those

6   regions are centered around?

7   A.   So we have satellite offices located in those branch

8   locations.

9   Q.   And altogether they cover the whole state?

10  A.   They do.

11  Q.   Now, the field investigators, can you just tell the jury

12  what they are?

13  A.   Field investigators are RMV employees.  And they conduct

14  field audits of inspection stations, compliance checks of

15  inspection stations.  They do -- they actually do the physical

16  school bus inspections three times a year.  Those are their

17  primary responsibilities.  They conduct field investigations of

18  inspection stations, for instance, that are in noncompliance,

19  and they deal with consumer complaints.

20  Q.   Now, do you know the defendant, David Gaw?

21  A.   I do.

22  Q.   Do you see him in the courtroom today?

23  A.   I do.

24  Q.   Could you identify him by an article of clothing?

25  A.   The gentleman who just stood up.

1   Q.   Now, what was Mr. Gaw's job?

2   A.   Dave was the field supervisor for Region 2, Lawrence.

3   Q.   And what were his job responsibilities there?

4   A.   For Dave, oversaw the day-to-day operations of the field

5   staff.  So he would assign work, assign stations that the

6   inspectors audited, he would oversee any kind of work that we

7   had there.  He primarily was responsible for the work that came

8   in, got completed and got sent back to Quincy.

9          MR. BERLIN:  Your Honor, could the record note that

10  the witness has identified the defendant?

11         MR. CINTOLO:  Stipulate, your Honor.

12         THE COURT:  Okay.

13  BY MR. BERLIN:

14  Q.   Do you know Mark LaFrance?

15  A.   I do.

16  Q.   And what was -- and how do you know Mark LaFrance?

17  A.   Mark is the project manager for the vehicle inspection

18  program -- or was the project manager.

19  Q.   And what were his responsibilities with respect to vehicle

20  inspection stations and licenses?

21  A.   Dave oversaw -- excuse me.  Mark oversaw the entire

22  inspection program.  He was responsible for -- or had

23  responsibility for the program:  software development; working

24  with our network contractor, which is Parsons Technologies;

25  training of inspectors, he oversaw that, developed those

1    programs.  Any kind of -- any kind of -- anything that had to

2    do with the inspection program, he oversaw that.

3    Q.    Now, could you explain generally, like in terms of an

4    organizational chart, how you and Mr. LaFrance were related?

5    A.    Judith Dupile was the director, I was the assistant

6    director.  I reported directly to Judy.  And Mark, as the

7    project manager, reported directly to Judy as well.

8    Q.    And what about David Gaw?

9    A.    David reported directly to me.

10   Q.    Now, are there certain regulations that govern how

11   licenses to conduct vehicle inspections are issued by the RMV?

12   A.    There are.

13            MR. BERLIN:  Your Honor, may I approach the witness?

14            THE COURT:  You may.

15            MR. BERLIN:  Thank you.

16   BY MR. BERLIN:

17   Q.    Now, I'm showing you what's been marked as Government's

18   Exhibit 4 for identification.  Do you recognize that?

19   A.    I do.

20   Q.    And what is it?

21   A.    It's 540 CMR 4.0, which is the regulations that oversee

22   the vehicle inspection program.

23            MR. BERLIN:  Your Honor, the United States moves to

24   admit Government Exhibit 4.

25            MR. CINTOLO:  No objection, your Honor.

1          THE COURT:  All right.

2          (Government Exhibit No. 4 received into evidence.)

3          MR. BERLIN:  Could we have that up on the screen?

4    BY MR. BERLIN:

5    Q.   Now, looking at the first page of -- or, rather, the

6    second page of Exhibit 4, who can apply to get an inspection

7    station license?

8    A.   Any service station is eligible to apply.

9    Q.   And looking at page 3, how much is the application fee for

10   a station to apply?

11   A.   The application fee is $50.

12   Q.   Is there an order in which applications by service

13   stations for inspection licenses are granted or considered?

14   A.   Is there an order?

15   Q.   Yes.

16   A.   There's a -- the program is capped right now, and it's

17   been capped since, I believe, late 2009/early 2010.  So anybody

18   coming into the program today would either have to come off

19   that list, or we have cities and towns who do not have

20   inspection stations.  If a city or town did not have an

21   inspection station, they would be eligible to apply.

22   Q.   So if there was a geographic need?

23   A.   If there was a geographic need, yes.

24   Q.   And other than that, are they listed in -- the waiting

25   list is maintained in the order that --

1    A.   Chronologically as they're put on the list.

2    Q.   If a station is, in fact, issued a license, how much is

3    that fee?

4    A.   $100.

5    Q.   Besides the license, is there equipment that a station

6    would need?

7    A.   There is.  There's a workstation.  Basically, a computer

8    and a scan tool and a plug into the vehicle's onboard computer;

9    there's a light board, and then there's some basic shop

10   equipment which would be a jack, a tint meter, dial indicator

11   for checking front ends, that kind of stuff.

12   Q.   Approximately how much does that primary machine cost?

13   A.   About $2800.

14   Q.   And what about the rest of the materials?

15   A.   Maybe $1200 for -- again, for a regular passenger motor

16   vehicle inspection station.

17   Q.   Now, can you explain to the jury how site inspections work

18   that the field investigators would do?

19   A.   So if we had an application that came into the office and

20   it was approved to move forward and all the documentation that

21   we require was present, at that time we would assign --

22   whatever particular region that station is applying from, we

23   would assign a site assessment to the supervisor, and then the

24   supervisor would handle it in the region.

25   Q.   And would Mr. Gaw do those assessments?

1    A.    He would.

2    Q.    And would people he supervised also do those assessments?

3    A.    They would.

4    Q.    For a station that already has a license and is up and

5    running, do the field investigators interact with those

6    stations?

7    A.    Yes, they do.

8    Q.    And do they do inspections of those stations?

9    A.    We do compliance checks regularly.  We do at least three

10   compliance checks a year.

11   Q.    So as part of his job, would Mr. Gaw do those?

12   A.    He could.

13   Q.    And would he also interact with the owners of service

14   stations?

15   A.    Absolutely.

16   Q.    On what kind of basis?

17   A.    Any kind of day-to-day basis.  If they had questions or

18   concerns about the inspection program, any of our supervisors

19   would interact -- could interact with those service stations.

20   They could do an audit, they could do a site assessment.  Any

21   kind of those day-to-day operations could happen.

22   Q.    All of those interactions, that was part of Mr. Gaw's job?

23   A.    Sure.

24   Q.    Now, getting back to the waiting list you were describing,

25   is there a limit on the number of licenses that are issued?

1    A.    So the passenger -- regular passenger motor vehicle under

2    10,000, it's capped at 1600 stations.  We're a little bit over

3    that.

4    Q.    And when you say "regular passenger vehicle," is there a

5    special name for that kind of license?

6    A.    Class A.

7    Q.    So -- and is the Class A license different from other

8    licenses?

9    A.    It is different in the sense it just restricts you to

10   inspecting vehicles under 10,000 pounds.

11   Q.    And you said that the RMV has reached its limit?

12   A.    That's correct.

13   Q.    About when did that happen?

14   A.    Approximately, sometime in 2009.

15   Q.    And since 2009 has the RMV taken anybody off the waiting

16   list except for geographic need?

17   A.    We have.

18   Q.    And approximately how many?

19   A.    I believe maybe six or -- six.

20   Q.    Who at the Registry of Motor Vehicles maintained the

21   waiting list?

22   A.    Mark LaFrance.

23   Q.    Looking again at Exhibit 4, the section that's

24   highlighted, Section C --

25   A.    Section what?

1    Q.   Section C on -- it should be up on your monitor.

2    A.   Okay.

3    Q.   Are inspection licenses transferrable?

4    A.   They're not.

5    Q.   So one station -- can one station sell a license to

6    another station?

7    A.   No.

8    Q.   If a station owner sells his business, what happens with

9    the license?

10   A.   If they sell their business and they're staying at the

11   same location, we would recognize that new business owner and

12   allow them to apply.

13   Q.   So if I'm a station owner, we have a license, I can sell

14   my entire business?

15   A.   That's correct.

16   Q.   And the new owner would have the ability to do the --

17   A.   We would recognize their application.  We would allow them

18   to apply.  They would still have to go through the application

19   process, but we would allow them to apply.

20   Q.   But they wouldn't have to go on the waiting list?

21   A.   No.

22   Q.   What if a station owner was in one location and wanted to

23   move his station to another location?

24   A.   They could do that.  That's a straight change of location.

25   Q.   So there's a procedure for doing that?

1   A.   Yes, there is.

2   Q.   What if a current holder of a license goes out of

3   business?

4   A.   The license is retired.  If they just close and go out of

5   business, the license is retired.

6   Q.   Are you familiar with the term "merger" with respect to

7   inspection licenses?

8   A.   I am.

9   Q.   Just generally could you explain to the jury what that is?

10  A.   It would essentially just be one station owner partnering

11  with another station owner.  It would involve one station

12  moving, relocating to whomever they were merging with.

13  Q.   So there would be two existing service stations, and the

14  owner of one and the owner of the other would go into business

15  together?

16  A.   That's correct.

17  Q.   Now, what kind of -- if the first station -- if one of the

18  stations had an inspection license but the other did not and

19  they went into business together, what could happen through the

20  merger process?

21  A.   The license would transfer to wherever they relocated to.

22  We would allow that transfer to happen.

23  Q.   Just like -- so it's like they've gone into business and

24  then are moving the station?

25  A.   That's correct.

1  Q.   What submissions did the RMV require for that merger

2  process to go through?

3  A.   Generally we get a letter of intent from the station just

4  indicating what they're planning on doing.  In that case

5  it's -- they would complete the application.  There's articles

6  of incorporation that they have to submit, there's a business

7  certificate that they have to submit, the Department of Revenue

8  compliance certificate that they have to submit.

9       And in that case we generally, where they were merging, we

10  would try to get a statement from -- detailing the transaction,

11  signed and notarized by the two owners of the businesses.

12  Q.   And the paperwork, or the corporate ownership documents,

13  what's the purpose of getting those documents?

14  A.   To see who the directors are of the particular business.

15  Q.   And is there anything specifically that you're looking for

16  on that paperwork?

17  A.   In the case of a merger, we're looking for both owners of

18  the two businesses to be on that paperwork.

19  Q.   And why is it that you care that there would be both

20  owners on the paperwork?

21  A.   Because we were trying to determine whether it was a

22  legitimate merger.

23  Q.   You want to make sure that these are actually two people

24  going into business together?

25  A.   Yes.

1    Q.   And not selling from one to the other?

2    A.   That's correct.

3    Q.   Now, was there a process that RMV followed when someone

4    wanted the license by merging?

5    A.   Repeat the question?

6    Q.   Was there a process that someone seeking to merge would

7    have to go through with the RMV?

8    A.   Generally they would submit a letter of intent to us that

9    they were looking to move, relocate to another location and

10   merge with whatever that business was, if there's an existing

11   business where they're relocating to.

12   Q.   And were files kept as part of that process?

13   A.   That's correct.

14        MR. BERLIN:  Your Honor, may I approach?

15        THE COURT:  You may.

16   BY MR. BERLIN:

17   Q.   Now, I've just handed you what's been marked for

18   identification as Government's Exhibit 12.  Do you recognize

19   that file?

20   A.   I do.

21   Q.   And generally what is it?

22   A.   It's a station file.

23   Q.   And is it -- was that the type of file maintained by the

24   RMV in the regular course of its business?

25   A.   It is.

1        MR. BERLIN:  Your Honor, the United States moves to

2   admit Exhibit 12 -- Government Exhibit 12, which includes

3   Exhibits 12A through 12F.

4        MR. CINTOLO:  No objection.

5        THE COURT:  Okay.  It may be admitted.

6        (Government Exhibit Nos. 12A through 12F received into

7   evidence.)

8        MR. CINTOLO:  I'm sorry.  12A through what?

9        MR. BERLIN:  12F.

10       MR. CINTOLO:  -F.

11  BY MR. BERLIN:

12  Q.   Now, up on the screen for the jury's sake, what is that?

13  A.   That's the folder that we would have kept the station file

14  in.

15  Q.   And what's the name of the station on the file?

16  A.   Stoneham Autoworks.

17  Q.   Now, you said that the process would begin by getting a

18  letter of intent regarding a merger?

19  A.   That's correct.

20       MR. BERLIN:  And could we see Exhibit 12A?

21  Q.   Now, what's Exhibit 12A?

22  A.   So it's a letter of intent from Pignatare Service Center.

23       MR. BERLIN:  And if we could just enlarge the text

24  here?

25  Q.   What's this stamp here?

1    A.    It's the notary seal.

2    Q.    And could you read for the jury what the text says here?

3    A.    "My name is Frank Pignatare.  I am the owner of inspection

4    station PB004767, Pignatare Service Center.  My business has

5    been closed for a few months due to a tough time to conduct

6    business with this economy.  So I have sold the gas station and

7    have decided to become a partner with Stoneham Autoworks, 490

8    Main Street, Stoneham, Massachusetts.  I would like to transfer

9    my inspection station license to this location.

10        "Thank you, Frank Pignatare."

11   Q.    When it says "PB004767," what's that?

12   A.    That's the station number.

13   Q.    Does every station have one of those numbers?

14   A.    It's an identification number for our purposes.

15   Q.    Now, do you know how this document was received by the

16   RMV?

17   A.    By mail, I assume.

18        MR. CINTOLO:  Objection, your Honor, as to what he

19   assumes.

20        THE COURT:  It may stand.

21        MR. BERLIN:  Could we show the top right corner?

22   BY MR. BERLIN:

23   Q.    Do you know -- can you read this for the jury?

24   A.    "Application sent out 1/7/13."

25   Q.    And do you know what this means?

1   A.   It means we sent them an application.

2   Q.   On that date?

3   A.   That's correct.

4   Q.   January 7, 2013?

5   A.   That's correct.

6   Q.   And how would that application have been sent out?

7   A.   We would have mailed it.

8   Q.   And would applications always be mailed out?

9   A.   Always mailed.

10  Q.   I'm showing you Exhibit 12B.  What is this?

11  A.   That's the station application form.

12  Q.   And what station is submitting this?

13  A.   Stoneham Autoworks.

14  Q.   And who is the purported contact person?

15  A.   Mike Youssef.

16  Q.   Now, looking at just the top third, what kind of

17  application is this?

18  A.   So it's indicating that they're merging their partnership

19  with Stoneham Autoworks.

20       MR. BERLIN:  And actually, if we just expand the box a

21  little bit and look further down.

22  Q.   Do you see where there is a circle around "Class A

23  license"?

24  A.   I do.

25  Q.   And what does that mean?

1    A.   It's indicating that they're applying for a Class A

2    license.

3    Q.   The circle with the initials, does that mean anything?

4    A.   It means -- it's the initials of Angelina Echeverria.

5    She's the one who sent the application.

6    Q.   What was the applicant supposed to do once they received

7    this form?

8    A.   Complete the application in its entirety and then resubmit

9    it back to us with the required documentation.

10   Q.   And what were the documents that were required?

11   A.   Again, a business certificate, articles of incorporation

12   from the Secretary of State's office, and a compliance

13   certificate from the Department of Revenue.

14   Q.   Now, I'm showing you -- I'm going to show you Exhibit 12C,

15   if you could look at the screen.  What is this document?

16   A.   Those are the articles of incorporation.

17   Q.   And looking at the Section 3 in the middle of the

18   document, so what is this list?

19   A.   So it's the corporate officers.

20   Q.   And that's what you were talking about before?

21   A.   That's correct.

22   Q.   And you see who is the -- listed as the director on the

23   bottom here?

24   A.   Frank Pignatare.

25   Q.   And above that, the other director?

1    A.    Michael Youssef.

2    Q.    And that would be what you were looking for in a merger?

3    A.    That's correct.

4    Q.    Now, once the application came back with the materials,

5    what would happen next?

6    A.    If we got back all the documentation and it was in order,

7    we would send our site assessment.

8    Q.    And how would that be ordered?

9    A.    Pardon me?

10   Q.    How would the site assessment be ordered in?

11   A.    How would it be ordered or sent?

12   Q.    Yes.

13   A.    That could have been faxed, it could have been emailed --

14   scanned and emailed to the region.

15   Q.    Who would sort of -- who would make that site assessment

16   happen?  Who would --

17   A.    It would have been sent to the supervisor in the region

18   and then they would have assigned it.

19   Q.    Okay.  And what is that inspection for?

20   A.    It's basically just an inspection of the location that

21   they're moving into, primarily to make sure that the bay meets

22   our requirements, the inspection bay.

23   Q.    If you look at Exhibit 12D, what's this document?

24   A.    That's the page 1 of the site assessment.

25   Q.    And again, this is for Stoneham Autoworks?

1    A.   That's correct.

2    Q.   And looking at the bottom, who conducted this site

3    assessment?

4    A.   Dave Gaw.

5    Q.   Now, once this assessment was done, this initial

6    assessment, what would happen next?

7    A.   At that point the station's approved to go forward and we

8    would notify Parsons Technology, who's our contractor, that

9    they've been approved.  And they would at that point, I

10   believe, just kind of set up the workstation and make sure that

11   in this case the equipment was operating in the location as

12   designed.  They would assign them inspection stickers, that

13   type of stuff.

14   Q.   Can you explain for the jury what it is that Parsons does?

15   A.   They're a network contractor, so they maintain the VID,

16   which is the Vehicle Inspection Database, where all inspection

17   records are maintained.  They're required -- they provide all

18   the inspection equipment, the workstation that we discussed;

19   they conduct all the training for inspectors.  That's their

20   responsibility.  And they also provide all the inspection

21   stickers for us.

22   Q.   Are you familiar with a company called SGS Testcom?

23   A.   I am.

24   Q.   Can you explain who SGS Testcom is?

25   A.   They're a subcontractor for Parsons.

1    Q.    So they do some of Parsons' work?

2    A.    That's correct.

3    Q.    Do you know where SGS Testcom is located?

4    A.    I believe it's Upstate New York.

5    Q.    Now, at some point does Parsons communicate, or does

6    somebody communicate that the work with Parsons has been done?

7    A.    Essentially at that point it's the station contacting us

8    that the HCS setup has been completed, can we -- at that point

9    we would go down and do a secondary site assessment to confirm

10   that everything is completed.

11   Q.    Does Parsons have to send materials to the station owners?

12   A.    Well, in this case they would already have the

13   workstation, but they would send them stickers, consumables,

14   glue, that type of stuff.

15   Q.    And does the station owner have to send anything back to

16   Parsons?

17   A.    To Parsons?  Not to my knowledge.

18   Q.    Have you heard of something called a "Station

19   Participation Agreement Kit"?

20   A.    Yes, I have.  A SPA Kit.

21   Q.    Would the owner have to fill that out and send that back?

22   A.    They would.  They would.

23   Q.    Now, you were saying there's an additional inspection

24   that's required?

25   A.    There's a secondary inspection once the station has --

1    once the setup has been completed by Parsons.

2    Q.    And who at RMV would do that?

3    A.    Anybody in that particular region could complete it.

4    Generally it's completed by the person who did the initial,

5    but...

6    Q.    A field investigator?

7    A.    That's correct.

8    Q.    If you could look at your screen for Exhibit 12E.  Do you

9    recognize this?

10   A.    I do.

11   Q.    And what is this?

12   A.    That's the page 2 of the site assessment.

13   Q.    And, again, it's for Stoneham Autoworks?

14   A.    That's correct.

15   Q.    And who has done this inspection?

16   A.    Could you enlarge it?  Dave Gaw.

17   Q.    And if you look at the whole image again, there are

18   various checkmarks?

19   A.    Yes.

20   Q.    So what is the purpose of this inspection?

21   A.    So it's basically confirming that they have all the

22   required equipment that they have and they're ready to be

23   turned on.

24   Q.    And this is an essential part of the application process?

25   A.    It is.  We wouldn't turn it on without it.  We wouldn't

1    activate the station without it.

2    BY MR. BERLIN:

3    Q.   And "activate the station," what do you mean by that?

4    A.   It's just an electronic activation.  From our particular

5    office we authorize -- we call it "flipping the switch."  We

6    just flip the switch, so at that point they're eligible to

7    start conducting inspections.

8    Q.   And is there a licensing fee associated with this, with

9    actually being activated, that final step?

10   A.   It's the $50 application fee and the $100 licensing fee.

11   Q.   If you could look again at your screen for Exhibit 12F.

12   Could you read what this says?

13   A.   It says "Angelina, activated this station.  Everything

14   looked okay.  Should you mail the license?  Dave will be faxing

15   page 2 of site assessment."

16   Q.   Do you know who wrote this note?

17   A.   I believe it to be Mark LaFrance.

18   Q.   And when it says "activated this station," based on your

19   experience at the RMV, do you know what that means?

20   A.   It means to flip the switch, turn them on.  They've met

21   all our requirements and they're eligible to start inspecting

22   vehicles.

23   Q.   And "Should you mail the license," what does that mean?

24   A.   The actual paper license delivery could have happened a

25   couple of different ways.  Sometimes it's sent to the field and

1  they actually deliver it, and then oftentimes we mail it

2  directly to the station.

3  Q.   And then the last part, "Dave will be faxing page 2 of

4  site assessment"?

5  A.   That would be the page 2 that we just discussed.

6  Q.   Page 2 is another reference to that second site

7  assessment?

8  A.   That's correct.

9         MR. BERLIN:  Your Honor, may I approach again?

10         THE COURT:  All right.

11  BY MR. BERLIN:

12  Q.   I've just handed you what's been marked for identification

13  as Government Exhibit 10.  Do you recognize that exhibit?

14  A.   It's another station folder.

15  Q.   And again, it was maintained in the regular course of

16  RMV's business?

17  A.   That's correct.

18         MR. BERLIN:  Your Honor, the United States moves to

19  admit Government's Exhibit 10, which includes Government

20  Exhibit 10A.

21         MR. CINTOLO:  No objection.

22         THE COURT:  Okay.

23         (Government Exhibit Nos. 10 and 10A received into

24  evidence.)

25  BY MR. BERLIN:

1   Q.   Now, looking at that file, what service station is that

2   file for?

3   A.   Libby Corp.

4   Q.   And looking at Exhibit 10 -- actually, I'm sorry.  It's

5   page 2 of Exhibit 10.  10-2.  And what is this?

6   A.   Again, it's an application for an inspection station.

7   Q.   And this is for Libby Corp.?

8   A.   That's correct.

9   Q.   And at the bottom, who is purporting to be the contact

10  person?

11  A.   David Levine.

12  Q.   And what kind of application is this?

13  A.   For what station license or class?

14  Q.   Is it for a merger?

15  A.   At this point I can't tell just by looking at the

16  application.

17  Q.   If you look at the top where it says "new applicant" and

18  "ownership change," do you know what that means?

19  A.   I do.

20  Q.   What does that mean?

21  A.   It indicates it's an ownership change and Libby is

22  applying for an application for a license.

23  Q.   Looking at page 4 of Exhibit 10, this document -- again,

24  what is this document?

25  A.   The articles of incorporation.

1   Q.   And looking at the officers that are listed here in the

2   center of the page, do you see a bunch of Levines?

3   A.   I do.

4   Q.   And then the first director, do you see that?

5   A.   Yes.

6   Q.   And who is that?

7   A.   Robert Peach.

8   Q.   Looking at page 8, Exhibit 10-8, what is this?

9   A.   It's that page 1 of the site assessment.

10  Q.   And it's for Libby Corp.?

11  A.   That's correct.

12  Q.   And looking at the bottom of the exhibit, who did this

13  inspection?

14  A.   David Gaw.

15  Q.   And looking at page 7 of this exhibit, what's this?

16  A.   Page 2 of the site assessment.

17  Q.   And looking at the bottom where it says "Station

18  activation approved"?

19  A.   David Gaw.

20  Q.   Now, do you know how these files were maintained, where

21  they were kept at RMV?

22  A.   They were kept in our office.

23  Q.   And were they accessible to the people who worked in that

24  office?

25  A.   That's correct.

1   Q.   Including Mark LaFrance?

2   A.   Yes.

3   Q.   Did you have any role in reviewing this paperwork?

4   A.   I did.

5   Q.   And what was your role?

6   A.   In general, Angelina would bring me the paperwork just to

7   confirm that all the required documentation that we need was

8   within the folder.

9   Q.   And did you check on the information that was provided,

10  the accuracy of that information?

11  A.   Sometimes, but generally it was just to confirm that we

12  had all the documentation that we needed.

13  Q.   And were you relying on the truthfulness of the

14  representations that were made about the ownership?

15  A.   I was.

16  Q.   Did you rely on the truthfulness of the representations

17  made on the business certificate about owners of the

18  corporation?

19  A.   We did.

20  Q.   Now, you worked closely with Mr. Gaw.  You supervised him?

21  A.   That's correct.

22  Q.   Did Mr. Gaw ever disclose to you that he was receiving

23  money in connection with service stations that were seeking

24  licenses?

25  A.   No.

1           MR. CINTOLO:  Objection, your Honor.

2           THE COURT:  No, it may stand.

3           MR. BERLIN:  I'm sorry, your Honor?

4           THE COURT:  It may stand.  I overruled the objection.

5           MR. BERLIN:  Thank you, your Honor.

6    BY MR. BERLIN:

7    Q.   Did he ever mention that he was receiving finder's fees

8    for finding buyers of licenses and machines?

9    A.   He did not.

10   Q.   Did he disclose that he was receiving money from Simon

11   Abou Raad?

12   A.   No.

13   Q.   What about from service station owners generally?

14   A.   No.

15   Q.   Had you known that he had received payments, those

16   payments, would you have approved the stations' applications?

17   A.   No.

18   Q.   Who else at RMV had a role in reviewing and approving

19   merger applications?

20   A.   Judy Dupile.

21   Q.   And how about Mark LaFrance?

22   A.   Mark definitely.

23   Q.   Now, moving on, did the Registry of Motor Vehicles keep

24   track of the number of vehicle inspections that licensed

25   stations did?

1    A.    They did.

2    Q.    And why did they do that?

3    A.    General purposes of knowing where people are going to get

4    inspected.  Just general record-keeping.  You know, you run a

5    program, that's the type of stuff you maintain.

6              MR. BERLIN:  Your Honor, may I approach?

7              THE COURT:  All right.

8              MR. BERLIN:  Thank you.

9    BY MR. BERLIN:

10   Q.    I've just handed you what's been marked for identification

11   as Government's Exhibit 5.  Do you recognize that?

12   A.    I do.

13   Q.    And what is it?

14   A.    It indicates the paid tests by month and year of the

15   particular inspection stations.

16   Q.    And is that data that was maintained by the Registry of

17   Motor Vehicles?

18   A.    That's correct.

19             MR. BERLIN:  Your Honor, the Government moves to admit

20   Exhibit 5.

21             MR. CINTOLO:  No objection, your Honor.

22             THE COURT:  Okay.

23             (Government Exhibit No. 5 received into evidence.)

24   BY MR. BERLIN:

25   Q.    And this that's up on the screen, that's the folder that

1    that's in?

2    A.   Correct.

3    Q.   And looking at the next page and on the side of the page,

4    the left side, do you recognize this fax information?

5    A.   I do.

6    Q.   And whose fax information is that?

7    A.   It's our department's fax information.

8         MR. BERLIN:  No further questions, your Honor.

9                        CROSS-EXAMINATION

10   BY MR. CINTOLO:

11   Q.   Good morning.

12   A.   Good morning.

13   Q.   Mr. Devaney, my name is William Cintolo, and I represent

14   Dave Gaw.

15        Before you worked for the Massachusetts Registry of Motor

16   Vehicles, where were you employed?

17   A.   I worked for a company called Tremont Ale, Tremont Brewing

18   Company.  I did a little part-time work for a distributor out

19   in Central Mass., but primarily I was employed by Tremont Ale

20   Brewing Company.

21   Q.   You were asked some questions with regard to the process

22   of merging ownership, correct?

23   A.   Yup.

24   Q.   And you were asked whether or not there was a procedure

25   that existed.  Is that correct?

1   A.   Correct.

2   Q.   Is that procedure that exists in writing?

3   A.   Specifically?  No.

4   Q.   Okay.  Are there any writings at all with regard to either

5   the procedure in general or specific aspects of the procedure?

6   A.   Not necessarily the procedure.  The application indicates

7   the documentation that we require.

8   Q.   Okay.  Does the application define the word "merger"?

9   A.   No.

10  Q.   Does the application set forth what requirements exist for

11  a merger?

12  A.   No.

13  Q.   Now, you had indicated that what you do in the course of

14  your examination is you look over the documents to see if all

15  the documents required are there?

16  A.   Correct.

17  Q.   Do you question the truth of those particular documents?

18  A.   Not necessarily.

19  Q.   Okay.  Is it fair to say that when they come in, you

20  presume that they're truthful?

21  A.   Correct.

22  Q.   Is there anything on the documents that you -- strike

23  that.

24       Do you know if there is a writing that explains how much

25  interest an individual must keep in order to be a valid merger?

1   A.   No.

2   Q.   Do you know whether or not the individual needs to keep

3   some sort of interest, financial, in the business in order for

4   there to be a merger?

5   A.   We expect them to be business partners.

6   Q.   Now, when you say "we expect them," is there any writing

7   that indicates that?

8   A.   No.

9   Q.   With regard to the merger process, do you know when that

10  process began?

11  A.   Specifically, no.

12  Q.   Do you recall any conversations with Mark LaFrance with

13  regard to establishing that particular process?

14  A.   I'm sure we did.

15  Q.   I'm sorry?

16  A.   I'm sure we discussed it.

17  Q.   There's nothing in the rules and regulations of the

18  Registry of Motor Vehicles that discusses merger?

19  A.   It just discusses location change and ownership change.

20  Q.   But it doesn't discuss merger?

21  A.   It does not mention anything about merger, to the best of

22  my knowledge, no.

23  Q.   In fact, the CMR that you were asked to read from, or that

24  you were shown, indicates that no transfers would be allowed?

25  A.   Correct.  You cannot transfer the license.

1   Q.    Okay.  Is the word in that CMR -- is the word "transfer"

2   defined?

3   A.    I don't know.

4   Q.    Do you know whether there's any explanation as to what

5   constitutes a transfer?

6   A.    Not that I'm aware of.

7   Q.    Do you know whether or not -- strike that.

8         With regard to the first one you were shown, and I believe

9   that was Exhibit 12, and you were shown something -- do you

10  still have that?

11  A.    I have it.

12  Q.    I want you to look at the folder -- the top of the folder

13  on Exhibit 12.  And it has a name there, does it not?

14  A.    A folder?

15  Q.    Yes.

16  A.    "Stoneham Autoworks."  "Stoneham Autoworks."

17  Q.    Stoneham Autoworks.  It has more than that, doesn't it?

18  The folder.  Right up on top of the manila folder.

19  A.    "Stoneham Autoworks, Inc."

20  Q.    "Inc."  Okay.  So that's a corporation, correct?

21  A.    Correct.

22  Q.    The license was in the name of the corporation --

23  A.    Correct.

24  Q.    -- correct?

25        So if I bought the corporation, I'm not changing the

1    entity.  There's no transfer of that license, correct?

2    A.   I don't want to say for certain.  I mean, I'm not a

3    complete expert on businesses and how they --

4    Q.   And you don't know?  You don't know whether or not that

5    constitutes a transfer?

6    A.   Would you repeat the question again?

7    Q.   If the license is in the name of a corporation and

8    somebody buys the corporation --

9    A.   Yup.

10   Q.   -- okay, the license is not being transferred, is it?

11   A.   No.

12   Q.   So with regard to Stoneham Autoworks, that was a

13   corporation, right?

14   A.   Okay.

15   Q.   Same thing with regard to Libby, right?  That was a

16   corporation too, right?

17   A.   I believe so.

18   Q.   Okay.  So the process is that an application is

19   filed -- oh, by the way, when you said these documents are kept

20   in your office, or in the office, that's Quincy?

21   A.   That's correct.

22   Q.   And I believe you were also asked whether or not anybody

23   would have access to them, and you said anybody in this office

24   or in the office would have access to them?

25   A.   That's correct.

1    Q.    So that would be you?

2    A.    Correct.

3    Q.    I can't pronounce her last name.

4    A.    Echeverria.

5    Q.    She would have access to them?

6    A.    Correct.

7    Q.    LaFrance would have access to them?

8    A.    Correct.

9    Q.    Mr. Gaw wasn't in the Quincy office?

10   A.    He was.

11   Q.    He was?  That's where he was assigned?

12   A.    It's not where he was assigned.

13   Q.    But he would come there occasionally?

14   A.    Absolutely.

15   Q.    Do you know whether or not he ever pulled the file that's

16   reflected in Exhibit 12?

17   A.    I don't.

18   Q.    Do you know whether or not he examined that file to look

19   at the directors and officers of the corporation?

20   A.    I don't.

21   Q.    Do you know other than the inspections whether or not

22   Mr. Gaw had seen any piece of paper in Exhibit 12?

23   A.    I don't.

24   Q.    Now, during the course of your direct examination, you

25   were asked about the site assessments.  Do you remember that?

1    A.    Yeah.

2    Q.    And you were asked with regard to how they were done.  And

3    basically the first one, I believe you had indicated what is

4    done in that one is they check to see if the size is big

5    enough?

6    A.    It's generally what we're looking for, to make sure it's a

7    business and that the bay meets our requirements.

8    Q.    And the bay meets your requirements, correct?

9    A.    Correct.

10   Q.    On that first one, is there anything else other than the

11   bay meets your requirements that has to be done?

12   A.    I believe we're just -- the company information listed at

13   the top, we list the bay size, and that's it.

14   Q.    That's it.  And so if it is not 10 by 30 -- that's the

15   measurement, right?

16   A.    Correct.

17   Q.    If it's not 10 by 30, does the individual have an

18   opportunity to correct that?

19   A.    He could.

20   Q.    Okay.  So, in essence, if it doesn't meet on the first

21   examination the length and width requirements, it can be

22   changed?

23   A.    It can be altered to meet our requirement.

24   Q.    Does Mr. Gaw or any inspector have any discretion to waive

25   that particular requirement?

1    A.    No.

2    Q.    Can Mr. Gaw tell somebody, Although it's 29 and 3/4

3    inches, don't worry about the quarter inch?

4    A.    Could it happen?

5    Q.    Does he have the authority to do that?

6    A.    No.

7    Q.    So it's got to meet that 10 by 30.

8          And are you aware of any of the mergers that we're talking

9    about here, that they didn't meet the 10 by 30?

10   A.    Not that I'm aware of.

11   Q.    So after the first assessment, there is a subsequent

12   assessment done, correct?

13   A.    Correct.

14   Q.    And if my recollection is correct, you were talking about

15   a company called Parsons?

16   A.    They're the network contractor.  They're the network

17   contractor.

18   Q.    Okay.  Parsons is your contractor?

19   A.    That's correct.

20   Q.    And they have a subcontractor?

21   A.    They do.

22   Q.    And who is that?

23   A.    SDS.

24   Q.    So SDS comes out after -- or if there is a question with

25   regard to the equipment.  And do they check the equipment?

1    A.    They do the -- we call it an HCS.  It's the basic setup of

2    the equipment to make sure that it's operating correctly and

3    it's communicating with us.  Frankly, I've never gone on one

4    so...

5    Q.    But the subcontractor of Parsons who produces the

6    equipment, they come out and say, Here's the way it's set up,

7    and they help set it up if it has to be helped to be set up?

8    A.    Correct.

9    Q.    And the next inspection that's done by the field inspector

10   is just to see if, in fact, the equipment is operating?

11   A.    Well, no.  To see if the equipment is operating and to

12   make sure all the other required equipment that we require is

13   present and the bay's set up correctly.

14   Q.    And there's a list of the equipment?

15   A.    It's on that page 2 site assessment.

16   Q.    And does Mr. Gaw have any discretion to waive if they

17   don't have one of those pieces of equipment?

18   A.    No.

19   Q.    No.  All he does is check to see if it's there --

20   A.    Correct.

21   Q.    -- correct?

22        Now, you had indicated -- I believe the question asked was

23   is that an important aspect in the process?

24   A.    The page 2 site assessment was an important --

25   Q.    Yeah.

1    A.    -- aspect?

2          It is.

3    Q.    Okay.  I believe the prosecutor asked you is that an

4    important process in your decision to --

5    A.    Is it an important process in the decision to activate

6    them?

7    Q.    Yeah.

8    A.    It's important in the sense we won't activate them without

9    it.

10   Q.    Okay.

11   A.    So, yeah, I guess it's important.

12   Q.    With regard to the activation of that license -- and you

13   were asked to read the letter from Ms. Echeverria.

14   A.    The letter wasn't -- I don't think --

15   Q.    The Libby Corp.  That's --

16   A.    You're talking about the letter that I -- hold on.  I read

17   two things.

18   Q.    I'm sorry.  It's a notice, not a letter.

19   A.    The note.

20   Q.    The note, right.  And what does it say?

21          MR. CINTOLO:  I'm sorry.  What number is it?  Could

22   you put it up?  Thank you.

23   Q.    They're going to put it on the screen for you.  Wait a

24   second.  It's Exhibit 12F.

25   A.    I have it.

1    Q.   Do you see it?

2    A.   Yeah.  "Angelina activated the station.  Everything looked

3    okay.  Should you mail the license?  Dave will be faxing page 2

4    of the site assessment."

5    Q.   Okay.  So the -- it was activated before you even got that

6    page?

7    A.   I can't say for certain.  I wasn't there when it was

8    activated, but it appears by the note.

9    Q.   Do you remember whether or not you saw the note before it

10   was activated?

11   A.   I'm sure -- I couldn't tell you whether I saw the note or

12   not back when it was activated.

13   Q.   And that indicates it was activated back before that page

14   2 was even sent?

15   A.   It might indicate that, yeah.

16   Q.   Okay.

17   A.   It says, "Activated the station.  Everything looked okay."

18   As reading this, it appears that Mark LaFrance activated it.

19   Q.   And when you say it looked like everything was okay, if

20   there was a piece of equipment that should have been on the

21   list and was not on the list, would the person who applied have

22   the opportunity to go get that piece of equipment?

23   A.   They would.

24   Q.   Okay.  So we're talking, like, if there was a jack that

25   was missing, they could go out and buy a jack, right?

1    A.    Sure.

2    Q.    I mean, it wasn't like you had a one-time chance and each

3    one of these things had to be there on a certain day?

4    A.    No.   If we went back to do the page 2 and they were

5    missing certain equipment, we'd tell them to get it.

6    Q.    Yeah.   You would tell them to buy it?

7    A.    We would tell them to get it.

8    Q.    Right.   This isn't rocket science.   If you don't have a

9    jack, if you don't have a wrench, you don't have pliers, go get

10   it.

11   A.    Correct.

12            MR. CINTOLO:   Bear with me a moment, your Honor.

13            (Pause.)

14   Q.    Would it be fair to say that the reason there is a demand

15   for inspection licenses is because it increases the

16   profitability or the business volume of a particular station?

17   A.    I think that would be fair.

18   Q.    So if -- and that's a pretty well-known fact?

19   A.    Yeah, I would agree.

20   Q.    Okay.   And so that if a corporation has the right to get a

21   license and they get a license, would it be fair to say that

22   the existence of the license in that corporation's name makes

23   the corporation more valuable?

24   A.    Yeah.

25   Q.    So if I'm going to buy the corporation, all right, I'm not

1  going to pay $100 for it, am I?  I'm going to pay what the

2  corporation's worth?

3  A.   If you're purchasing the corporation?

4  Q.   Yeah.

5  A.   Yeah.

6  Q.   If I'm merging and I have to pay the person whose

7  corporation -- a fee to become a partner with me, that

8  corporation -- I'm paying what that corporation is worth?

9  A.   If you're buying into a business?

10           MR. BERLIN:  Objection, your Honor.

11           THE COURT:  Sustained.

12  BY MR. CINTOLO:

13  Q.   There's two ways to bypass the waiting list, correct?  I

14  can either buy the corporation and then --

15  A.   Correct.

16  Q.   -- apply, and then move to have the license -- petition to

17  have the license moved somewhere else?

18  A.   And merge with another company.

19  Q.   And merge with another company?

20  A.   Well, then that other company obviously would be getting

21  involved.  Or a particular city or town that did not have a

22  station.

23  Q.   Say that again?

24  A.   So if we have a city or town that did not have a station,

25  we would allow them to apply.

1   Q.   But the two that -- other than if you don't have it is buy

2   the corporation, petition to move it, in which case those

3   are pretty --

4   A.   If you bought a corporation in an existing location, you

5   bought it out, we would only restrict -- you would have to stay

6   there for one year.

7   Q.   Correct.  Then you could move it if you want?

8   A.   Then you could move it.

9   Q.   And same thing -- not with regard to a merger, though,

10  right?  You could merge it right away?

11  A.   Generally, anybody merging is moving a license from one

12  location to another location and merging with that Station B.

13  Q.   Do you know whether or not Frank Pignatare actually

14  drafted those documents in Exhibit 12?

15  A.   Which documents are we talking about?

16  Q.   The document that says he is merging or he is selling his

17  business.

18  A.   The letter of intent?

19  Q.   Yes.

20  A.   Do I know if he -- I wasn't there when he wrote it.

21  Q.   Correct.

22  A.   Correct.

23  Q.   Do you know whether or not Mr. Gaw was there when he wrote

24  it?

25  A.   I don't.

1    Q.    So by looking at the document itself, you can't tell that

2    it's not correct?

3    A.    Other than a notary stamped it.

4    Q.    Correct.

5    A.    And she's testifying that he signed it, I guess.

6    Q.    But you don't know, and just looking at it was not going

7    to tell you?

8    A.    No.

9              MR. CINTOLO:  One more moment, your Honor.

10             (Pause.)

11   Q.    You will agree that most of the stations were activated

12   before all the paperwork from the inspectors was provided to

13   Quincy?

14   A.    I wouldn't agree with that.

15   Q.    Some of it?

16   A.    It could have happened.

17   Q.    Okay.

18   A.    I'll expound a little bit.  On occasion if somebody did

19   the page 2 of the site assessment that day and they were faxing

20   it later that day, they could call and say, I've completed it.

21   I'll fax it this afternoon.  Could you please activate the

22   station.  That could have happened.

23   Q.    Okay.  Thank you, sir.

24   A.    You're welcome.

25             THE COURT:  Mr. Berlin, anything?

1          MR. BERLIN:  No further questions, your Honor.

2          THE COURT:  All right, Mr. Devaney.  Thank you.  You

3   may step down.

4          THE WITNESS:  Thank you.

5          (The witness is excused.)

6          THE COURT:  We'll take the morning recess at this

7   point.

8          THE CLERK:  All rise for the Court and the jury.

9   We'll take the morning recess at this point.

10         (The Court and jury exit the courtroom and there is a

11  recess in the proceedings at 11:03 a.m.)

12         THE CLERK:  All rise for the Court and the jury.

13         (The Court and jury enter the courtroom at 11:29 a.m.)

14         THE CLERK:  Be seated.

15         MR. MERRITT:  Your Honor, the government calls Special

16  Agent Mark Toulouse.

17                    MARK TOULOUSE, duly sworn

18         THE CLERK:  State your name and spell your last name

19  for the record.

20         THE WITNESS:  Mark Toulouse, T-O-U-L-O-U-S-E.

21                    DIRECT EXAMINATION

22  BY MR. MERRITT:

23  Q.   Where do you work?

24  A.   I work with the FBI.

25  Q.   And how long have you worked for the FBI?

1    A.    A little over 12 years.

2    Q.    And what squad do you work on?

3    A.    I currently work on the Public Corruption Squad.

4    Q.    And are you one of the co-case agents of the investigation

5    that led to the indictment in this case?

6    A.    I am.

7    Q.    And did you -- as part of your duties, did you monitor and

8    record the calls that were authorized by the Court under the

9    Title III wiretap?

10   A.    I did.

11   Q.    Did you listen to all the pertinent calls?

12   A.    I did.

13   Q.    And from those, was a certain number of those calls

14   selected to play at the trial?

15   A.    Yes.

16   Q.    At trial.

17         MR. MERRITT:  May I approach, your Honor?

18         THE COURT:  You may.

19   BY MR. MERRITT:

20   Q.    I'm giving you what's been marked at Government's Exhibit

21   6, which contains calls described as 6A through 6U.  What does

22   Exhibit 6 contain?

23   A.    It contains 21 calls.

24   Q.    And are those calls true and accurate recordings of the

25   specific parts of the intercepted calls from the wiretap?

1   A.   They are.

2         MR. MERRITT: Your Honor, I'd move in Exhibit 6A

3   through -U.

4         MR. CINTOLO: No objection.

5         THE COURT: All right. Admitted.

6         (Government Exhibit Nos. 6A through 6U received into

7   evidence.)

8   BY MR. MERRITT:

9   Q.   And were transcripts prepared for those calls as well?

10   A.   Yes.

11   Q.   And are those transcripts accurate representation of what

12   is said on the tape?

13   A.   They are.

14   Q.   Then I'm going to ask you, if you would, to at least play

15   the first four calls at this point, and let's start with

16   Exhibit 6A. And if I could ask -- let me give you a

17   transcript.

18         So on Exhibit 6A, this is a call on December 14, 2012?

19   A.   Yes.

20         MR. MERRITT: All right.

21         (Audio recording played.)

22         MR. MERRITT: If we could then, now, go to Exhibit 16B

23   which is a call on December 17, 2012.

24   A.   That's correct.

25         (Audio recording played.)

1    Q.   Agent Toulouse, do you know who is Mike that's referred to

2    on this?

3    A.   I do.

4    Q.   Who is that?

5    A.   Mr. Michael Youssef.

6    Q.   And what business did he own?

7    A.   Stoneham Autoworks.

8    Q.   And then there's a reference to an individual named Joe

9    Elias?

10   A.   Yes.

11   Q.   And who is Joe Elias?

12   A.   Joe Elias was an individual who owned another service

13   station.

14   Q.   And there's a reference on the third page where the

15   defendant says, "Yeah, the guy's name is Mike.  He was the one

16   that didn't want to pay the money before."

17        Are you aware of anything that happened before with

18   respect to Mike?

19             MR. CINTOLO:  Objection, your Honor.

20             THE WITNESS:  Yes.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.

23   BY MR. MERRITT:

24   Q.   Yes?

25   A.   Mr. Youssef spoke with Mr. Abou Raad prior to this --

```
 1            MR. CINTOLO:  Objection, your Honor.

 2            THE COURT:  Let me see you.

 3            (Discussion at sidebar and out of the hearing of the

 4  jury:)

 5            MR. CINTOLO:  I just don't know -- is this another

 6  call?  I don't know where --

 7            MR. MERRITT:  This would -- he would testify that

 8  Mr. Youssef had spoken with Abou Raad and that --

 9            THE COURT:  Is this something he heard?

10            MR. MERRITT:  Well, actually, your Honor --

11            THE COURT:  How does he know this?

12            MR. MERRITT:  He knows it from Mr. Youssef.

13  Mr. Youssef is going to testify anyway.

14            THE COURT:  If he only knows it through Youssef, it's

15  hearsay, I guess.

16            MR. MERRITT:  Yeah.

17            (In open court:)

18  BY MR. MERRITT:

19  Q.   All right.  If we could then move on to Exhibit 6C.  And

20  this is another call on the same day, December 17, 2012?

21  A.   Correct.

22  Q.   And just how long had the court authorized the wiretap?

23  A.   Approximately three days.

24            MR. MERRITT:  Okay, if we could play Exhibit 6C.

25            (Audio recording played.)
```

1    Q.    And the reference there that Simon Abou Raad says, "I

2    think it's funny, Roger giving you 65," who's Roger again?

3    A.    Roger is the source that initially brought this

4    investigation -- this information to us.

5    Q.    And he was the one that the FBI was going to try to find

6    the money for?

7    A.    That's correct.

8    Q.    All right.  Let's go to the last call in this sequence,

9    Exhibit 6D.  Is this a call on December 20, 2012?

10   A.    That's correct.

11        (Audio recording played.)

12   Q.    There was a reference there about, again, Roger.  It says

13   Roger was going to open up another place, in reference to

14   opening up a station?

15   A.    Yes.

16   Q.    What was going on in the investigation with respect to

17   that, if you recall?

18   A.    We were working with Roger and we were -- Roger wanted to

19   open up another station, and we wanted to use this as an

20   opportunity to have him purchase an inspection machine and

21   license to further this investigation, and there were

22   some -- there were some issues with his purchasing of the

23   station and was it big enough.  And this was what was going on

24   at the time.

25        MR. MERRITT:  I have no further questions at this time

```
 1    for the witness, your Honor.

 2              MR. CINTOLO:  Can we approach for one second, your

 3    Honor?

 4              (Discussion at sidebar and out of the hearing of the

 5    jury:)

 6              MR. CINTOLO:  Very quickly, your Honor, my

 7    understanding is they're going to be calling him on more than

 8    one occasion, "him" being the agent.  I would rather do my

 9    cross-examination only one time.  I just didn't want to say it

10    in front of the jury.

11              MR. MERRITT:  That's correct, your Honor.  Instead of

12    just playing all 12 calls at once, I thought it would be a good

13    thing to break it up.

14              THE COURT:  So you're going to -- okay.  All right.

15              MR. CINTOLO:  So I'm just going to say "No questions

16    at this time."

17              THE COURT:  I don't have any problem with that.

18              MR. CINTOLO:  Okay.

19              THE COURT:  How many times do you think you're going

20    to --

21              MR. BERLIN:  I think it's a total of three.

22              THE COURT:  So you're going to bring in --

23              MR. MERRITT:  We have other witnesses.

24              THE COURT:  -- other witnesses in between and bring

25    him back?
```

1            MR. MERRITT:  If that's acceptable.

2            THE COURT:  I would have liked to have known that, but

3      that's all right.

4            MR. MERRITT:  I thought I mentioned that at the

5      pretrial.

6            THE COURT:  Maybe you did.

7            (In open court:)

8            THE COURT:  All right.  You may reserve your

9      cross-examination, Mr. Cintolo.

10           MR. CINTOLO:  Thank you, your Honor.

11           THE COURT:  You may step down, Agent Toulouse, for the

12     time being.

13           (The witness is excused.)

14           MR. BERLIN:  Your Honor, the United States calls Frank

15     Pignatare.

16                     FRANK PIGNATARE, duly sworn

17           THE CLERK:  State your name and spell your last name

18     for the record.

19           THE WITNESS:  My name is Frank Pignatare,

20     P-I-G-N-A-T-A-R-E.

21           THE CLERK:  Thank you.

22                     DIRECT EXAMINATION

23     BY MR. BERLIN:

24     Q.   Good morning, Mr. Pignatare.

25     A.   Good morning.

1   Q.   How are you?

2   A.   Good.

3   Q.   Could you please tell the jury the town where you live?

4   A.   The town?

5   Q.   Yeah.

6   A.   Agawam, Mass.

7   Q.   And what do you do for a living?

8   A.   I'm retired right now but I used to have a full-service

9   station:  gasoline, repairs, inspection station and car wash.

10   Q.   And what was the name of that service station?

11   A.   F. Pignatare Service Center.

12   Q.   And where was it located?

13   A.   Agawam, Mass.  Main Street, Agawam, Mass.

14   Q.   And how long did you run that station?

15   A.   About 33 years.  33, 34 years.

16   Q.   And what kind of services did you do there?

17   A.   Services?

18   Q.   Yes.

19   A.   All your automotive repairs:  tires, brakes, engine,

20   tune-ups.

21   Q.   And did you have a license to do -- a Class A license to

22   do inspections of passenger vehicles?

23   A.   Yes, I did.

24   Q.   And you had machines to do that inspection?

25   A.   Yes.

1    Q.    And for how long did you have that license?

2    A.    When the program -- since the program started.  I don't

3    really remember how many years, but it was quite a while.

4    Q.    And you said that you've closed your business?

5    A.    Yes; I sold it.

6    Q.    Why did you close your business?

7    A.    I got up in age, number one; second of all, my wife passed

8    away.  She did all my book work and stuff, so it was kind of

9    hard after that.  And just -- it was time.  It was time to

10   retire.

11   Q.    And to whom -- to whom did you sell your business?

12   A.    I sold it to a fellow from East Longmeadow, a Richard

13   Frisbie.  He was going to make a convenience store out of the

14   whole place.

15   Q.    And what did he do with the location?

16   A.    He, in turn, sold it to Bolduc, which is another big

17   outfit in Western Mass., and he's going to make it a

18   convenience store.

19   Q.    Now, when you closed your business, what did you do with

20   your inspection license?

21   A.    The license?  I turned it in to the registry, in to the

22   inspection people.

23   Q.    And did you notify the registry that you were no longer

24   going to be doing business?

25   A.    Yes.

1          MR. BERLIN:  Your Honor, may I approach the witness?

2          THE COURT:  You may.

3     BY MR. BERLIN:

4     Q.   I've just handed you what's been marked Government's

5     Exhibit 11 for identification.

6     A.   Yes.

7     Q.   Do you recognize that exhibit?

8     A.   Yes, I do.

9     Q.   And what is it?

10    A.   It's a letter I faxed to the registry people.

11         MR. BERLIN:  Your Honor, the United States moves to

12    admit Government's Exhibit 11.

13         MR. CINTOLO:  No objection.

14         THE COURT:  All right.  It's admitted.

15         (Government Exhibit No. 11 received into evidence.)

16         MR. BERLIN:  Could we have it on the screen?

17    BY MR. BERLIN:

18    Q.   Now, Mr. Pignatare, could you read this to the jury?

19    A.   "To whom it may concern:  F. Pignatare's Service Center

20    Inspection Station No. 4767 will stop conducting inspections on

21    Friday, August 10th, at 4:30 p.m.  We will not be reopening.

22    The building and property have been sold.  Closing will be on

23    August 15th, a.m.  The inspection equipment will be for sale if

24    anybody is interested.

25         "If any questions or problems, please call."

1    Q.   Now, when you say that "the inspection equipment will be

2    for sale," what did you mean?

3    A.   I mean if anybody was going to open up a station or was

4    interested in opening up a station, I had the equipment for

5    sale.  Because I purchased it; the equipment was mine.

6    Q.   Now, were you just selling the equipment?

7    A.   Yes.

8    Q.   Were you selling the license?

9    A.   No.  No.

10   Q.   Why not?

11   A.   You can't do that.

12   Q.   Now, did you ever successfully sell the equipment?

13   A.   Did I ever -- I'm sorry?

14   Q.   Did you sell the equipment?

15   A.   Yes, I did.

16   Q.   To whom did you sell it?

17   A.   I sold it to Mr. Simons.  Simons, I think his name was.

18   Simons?

19   Q.   Could his first name be Simon?

20   A.   Yes.

21   Q.   When did you do that?

22   A.   I think in -- it was in 2013.  It was after I -- a few

23   months after I closed.  I don't know the exact date -- what the

24   exact date was because I had it at my house in the basement.

25   Q.   How did you come into contact with Simon?

1    A.    He called me by phone.

2    Q.    And what did he tell you?

3    A.    He wanted to know if I still had the inspection equipment

4    for sale, and I told him yes, I did, and I told him how much I

5    wanted for it.  And he came up and looked at it and said he

6    wanted it.

7    Q.    So did he pay you for the machine?

8    A.    Yes, he did.

9    Q.    And how much did he pay you?

10   A.    $6,000.

11   Q.    Then did he take the machine?

12   A.    Yes.

13   Q.    Did you know what Mr. -- do you know what Simon was going

14   to do with the machine?

15   A.    He told me he had a station somewhere up on 495 and that

16   he was opening up an inspection station and he needed the

17   equipment because he got the inspection.

18   Q.    Have you ever met anyone named Michael Youssef?

19   A.    Not that I recollect, no.

20   Q.    Have you ever been involved in a company named Stoneham

21   Autoworks?

22   A.    No.

23   Q.    I'm showing you what's been previously admitted just on

24   the screen as Government's Exhibit 12A.  Do you recognize this

25   document?

1   A.   No.

2   Q.   And if we could just expand the bottom here, do you see

3   who this letter is supposedly from?

4   A.   Yes, me.

5   Q.   And that signature -- is this letter from you?

6   A.   No.

7   Q.   This signature here, is that your signature?

8   A.   No, it's not.

9   Q.   Have you ever -- do you see a stamp on the right side of

10  your screen?

11  A.   Yup, Caroline McAllister.

12  Q.   Have you ever met Caroline McAllister?

13  A.   No, I haven't.

14  Q.   Do you see in the letter where it says "I have decided to

15  become a partner with Stoneham Autoworks"?

16  A.   Uh-huh.

17  Q.   Were you becoming a partner in Stoneham Autoworks?

18  A.   I didn't even know where Stoneham was.

19  Q.   I'm showing you another exhibit on the screen,

20  Government's Exhibit 12C.

21  A.   Stoneham.

22  Q.   Looking at the Section 3, do you see here at the bottom

23  where it says "director" on the last line?

24  A.   Yes.

25  Q.   And then the name?

1    A.   Yeah.   That's my name.   I never saw that before.

2    Q.   Is this document accurate?

3    A.   No.

4         MR. BERLIN:   No further questions for this witness,

5    your Honor.

6         MR. CINTOLO:   Very briefly, your Honor.

7         THE COURT:   All right.

8                        CROSS-EXAMINATION

9    BY MR. CINTOLO:

10   Q.   Do you know that man?

11   A.   No.

12   Q.   Did you ever meet him before?

13   A.   I don't believe so.

14   Q.   When -- okay.   Thank you.

15        When this Simon fellow came out to talk to you, did he

16   mention any other names?   Did he mention the name David Gaw?

17   A.   No.

18   Q.   Did he tell you that Gaw was going to be purchasing the

19   equipment with him?

20   A.   Nope.

21   Q.   You didn't sign that document that you were just shown,

22   12 -- Exhibit 12, right?

23   A.   No.

24   Q.   Do you know who signed it?

25   A.   No, I don't.   No.

1          MR. CINTOLO:  Thank you, your Honor.

2          MR. BERLIN:  Nothing further.

3          THE COURT:  All right, Mr. Pignatare.  Thank you.  You

4     may step down.  You're excused.

5          (The witness is excused.)

6          MR. MERRITT:  Your Honor, the United States calls

7     David Levine.

8                    DAVID LEVINE, duly sworn

9          THE CLERK:  Have a seat.  State your name, spell your

10    last name for the record, keep your voice up and speak into the

11    mic.

12         THE WITNESS:  David Levine, L-E-V-I-N-E.

13         THE CLERK:  Thank you.

14                    DIRECT EXAMINATION

15    BY MR. MERRITT:

16    Q.   Mr. Levine, good afternoon.  What town do you live in?

17    A.   I live in Danvers, Massachusetts.

18    Q.   And what do you do for a living?

19    A.   I'm a service station owner.

20    Q.   What's the name of your service station?

21    A.   Dave's Enterprises doing business as Dave's Mobil.

22    Q.   And where's that located?

23    A.   That's in Danvers Square.

24    Q.   How long have you had that?

25    A.   Thirty-two years.

1   Q.   And the station you had in Danvers, does that have a

2   license to do vehicle inspections?

3   A.   Yes, it does.

4   Q.   How long have you had that license and how long have you

5   been doing vehicle inspections?

6   A.   For the 32 years I've been in business.

7   Q.   And about how many vehicle inspections a year do you do at

8   the Danvers gas station?

9   A.   About 6,000.  About 500 a month.

10  Q.   So is that a profitable part of your business?

11  A.   Yes.

12  Q.   How much, would you say?

13  A.   Well, the fee for the inspection is $29, and we would make

14  22.50 out of that before the increase on July 1st.

15  Q.   And you said you're doing five to six hundred stickers per

16  month?

17  A.   Correct.

18  Q.   And besides just doing the inspections, is there other

19  work generated from the inspections?

20  A.   Yes.

21  Q.   Now, at some point did you intend to open up a second gas

22  station?

23  A.   Yes, I did.

24  Q.   And where was that going to be?

25  A.   That was in Georgetown, Mass.

1    Q.    And what was the corporation that owned that, or owned

2    that --

3    A.    That was Libby Corporation.

4    Q.    And when did you open it up, or when did you start

5    planning the renovations to open it up?

6    A.    That was, I believe, October of '08, I took it over and

7    started --

8    Q.    And in your gas stations, you get deliveries from the

9    refineries having to do with your gas?

10   A.    Yes.

11   Q.    And those come from out of state?

12   A.    Gasoline deliveries?

13   Q.    Yeah.  Initially.

14   A.    Well, they -- sometimes.

15   Q.    Now, when you opened up the Georgetown station, did you

16   want to get a license to conduct inspections at that one as

17   well?

18   A.    Yes, I did.

19   Q.    And why did you want to do that?

20   A.    For the profitability of the business.

21   Q.    And did you contact any agency about that?

22   A.    Yes, I did.

23   Q.    What was that?

24   A.    I contacted the Registry of Motor Vehicles.

25   Q.    And do you recall who you spoke with?

1   A.    I spoke with Mark LaFrance.

2   Q.    And did you know Mark LaFrance?

3   A.    Yes.

4   Q.    How did you know him?

5   A.    From being in the station from time to time.  I think he

6   might have been a field investigator at one time before he

7   worked in the office.

8   Q.    And when you called about applying for an inspection

9   license for your new station, were you placed on a waiting

10  list?

11  A.    Yes.

12  Q.    And from time to time, did you call back to see where you

13  were on the waiting list?

14  A.    Yes, I did.

15  Q.    Do you remember having a conversation with Mark LaFrance

16  specifically about that?

17  A.    Yes.

18  Q.    As best you recall, what did you say to him and what did

19  he say to you?

20  A.    I asked him where I stood on the list and he asked me

21  where I was on the list the last time I had talked to him.  And

22  I told him that I thought I was -- he said that I was at about

23  250, so he told me that now I was 249.

24  Q.    And what was your reaction?

25  A.    I wasn't very happy.  I really wasn't getting anywhere

1    with him.

2    Q.    Now, do you know someone named Simon Abou Raad?

3    A.    Yes.

4    Q.    And what were the circumstances of how you met him?

5    A.    I met him at a -- it was a Mobil Oil outing at a Patriots

6    football game, and we were tailgating in the parking lot.  And

7    he also owned a Mobil station.  And I got talking to him and

8    mentioned that I happened to have been wanting to get an

9    inspection license.

10   Q.    And do you remember when this was approximately?

11   A.    I think this was about two years after I had opened the

12   station.

13   Q.    So sometime, maybe, in 2010 or so?

14   A.    About that, yeah.

15   Q.    And when you told Mr. Abou Raad that you were trying to

16   get an inspection license, did you mention that you were on a

17   waiting list?

18   A.    Yes.

19   Q.    And what did he say to you?

20   A.    He said that the list is very long and that they're not

21   issuing any more licenses and that you probably wouldn't end up

22   getting one.

23   Q.    And did he say he could do anything for you?

24   A.    He did.

25   Q.    What did he say?

1    A.    He said that he knew Mark LaFrance and thought that maybe

2    he could help me out.

3    Q.    And did he actually try to show you something as to how he

4    knew Mark LaFrance, or how well he knew him?

5    A.    Yes, he did.

6    Q.    What did he do?

7    A.    He showed me that he had his contacts and phone number on

8    his phone and that he was friendly with him and talked with him

9    a lot.

10   Q.    And did Mr. Abou Raad tell you -- give you any indication

11   of how much it was going to cost you if you went through him?

12   A.    Yes.

13   Q.    What did he say?

14   A.    He said it was going to cost about $55,000.

15   Q.    And what was your reaction to that?

16   A.    I really didn't want any part of that.

17   Q.    And so at that time you declined his offer?

18   A.    Yes.

19   Q.    Did you do anything about it?  Did you take any action?

20   A.    Well, I was going to go to my state rep and talk to my

21   state rep and find out if there was any other avenue that I

22   could go to get a license where I had been in business

23   and -- for over 30 years and had a clean record and thought

24   that I was entitled to running an inspection station.

25   Q.    But did you follow through with that?

1    A.    I never followed through with it, no.

2    Q.    Now, though, moving ahead to 2011, did you end up doing

3    the deal with Simon Abou Raad?

4    A.    I did.

5    Q.    And did you speak with him about that?

6    A.    Yes.

7    Q.    And how much was the price?  Was it still $55,000?

8    A.    No, it went to 65,000.

9    Q.    And did you agree to do it?

10   A.    Yes, I did.

11   Q.    Why did you agree at that point?

12   A.    Well, business was slow and I didn't think that I would

13   last without having the sticker program.

14   Q.    Did Simon Abou Raad explain to you how he could make this

15   work so you'd get the license?

16   A.    Yes.

17   Q.    What did he say to you?

18   A.    He said he would need a $15,000 down payment that would be

19   put in escrow with his attorney and to get the ball rolling.

20   And I gave him a check for the $15,000 and got the application

21   package from -- from Parsons, which was the company that ran

22   the program for the registry.

23   Q.    Now, did Simon Abou Raad explain to you what you would

24   have to do with regard to the application in terms of how he

25   was going to make this work?

1   A.    Yeah, I would have to fill it out and send it in to

2   Parsons.

3   Q.    All right.  Do you remember what else?  Did he say

4   anything about putting someone on your corporate documents?

5   A.    Yes, he did.

6   Q.    What did he say?

7   A.    He said that I was going to have to put somebody on my

8   corporate document as a director, and I could just do that

9   online.

10  Q.    And did he give you the name of the person you had to put

11  down?

12  A.    Yes, he did.

13  Q.    And who was that?

14  A.    The name was Robert Peach.

15  Q.    Did you know Robert Peach at the time?

16  A.    I did know Robert Peach at the time.

17  Q.    How did you know him?

18  A.    He was a neighbor of mine in a condominium in New

19  Hampshire, a second home that I had had.

20  Q.    Did you know him to be in the service station business?

21  A.    I knew he was in the service station business, yes.

22  Q.    Did you ever speak with Robert Peach about putting him

23  down as a director on your application -- your corporation

24  papers?

25  A.    No, I didn't.

1    Q.   Now, you said that there was some kind of escrow

2    agreement?

3              MR. MERRITT:  May I approach, your Honor?

4              THE COURT:  Yes, you may.

5    BY MR. MERRITT:

6    Q.   Mr. Levine, I've placed before you what we've marked as

7    Exhibit 7.  Do you recognize what that is?

8    A.   Yes.

9    Q.   Is that the escrow agreement that was provided to you by

10   Simon Abou Raad for the sale of the license inspection --

11   A.   Yes.  Yes, it is.

12             MR. MERRITT:  Your Honor, I would move in Exhibit 7.

13             MR. CINTOLO:  No objection.

14             THE COURT:  All right.

15             (Government Exhibit No. 7 received into evidence.)

16             MR. MERRITT:  Would you put that up, please?  And if

17   we could just highlight the first few paragraphs.

18   BY MR. MERRITT:

19   Q.   Where it says that "Whereas Raad is the owner of a certain

20   vehicle inspection machine, and whereas Libby will be

21   purchasing Raad's interest in the inspection machine, and

22   whereas the parties have entered into an agreement for the

23   purchase and sale of Raad's interest in said machine," and that

24   you've paid $15,000 toward the purchase price of $65,000, where

25   there's references to "inspection machine," Mr. Levine, were

1   you paying $65,000 just for the equipment?

2   A.   No, it was basically the inspection license.

3            MR. MERRITT:  All right.  If we could just scroll

4   down.

5   Q.   And it indicates here that you'll pay the balance of the

6   purchase price due for the purchase of the inspection machine

7   in the amount of $50,000, which amount shall be delivered to

8   the escrow agent, as hereafter defined, and shall be held in

9   escrow and then released to Raad pending satisfaction of the

10  following conditions:  The completion of the transfer of the

11  inspection machine to Libby -- and that's your corporation,

12  Libby?

13  A.   Yes.

14  Q.   The approval of the location change by the Massachusetts

15  Registry of Motor Vehicles; and, three, Libby being in

16  possession of the machine.

17       And, again, where the reference is all about the machine,

18  is that what you understood this to be or was it the license as

19  well?

20  A.   It was the license as well.

21  Q.   I've also put, I think, in front of you what's marked as

22  Exhibit 8.  Do you see that, Mr. Levine?

23  A.   Yes.

24  Q.   Okay.  What are Exhibit 8?

25  A.   That's a check for $50,000 that was written to Simon.

1   Q.   Okay.  And on the back is there another check?

2   A.   That's a check for $15,000 written out to Simon.

3   Q.   And are those the checks you provided to Abou Raad in

4   exchange for getting the license?

5   A.   Yes.

6            MR. MERRITT:  Your Honor, I would move in Exhibit 8.

7            MR. CINTOLO:  No objection, your Honor.

8            THE COURT:  Okay.

9            (Government Exhibit No. 8 received into evidence.)

10           MR. MERRITT:  So the jury can see, highlight the top,

11  please.

12  BY MR. MERRITT:

13  Q.   And that's a check for $50,000 from your corporation to

14  Mr. Raad?

15  A.   Yes.

16           MR. MERRITT:  And the other one?

17  Q.   And that's a check for $15,000?

18  A.   Yes.

19  Q.   Now, did you -- you mentioned an application.  Did you

20  send in an application to the RMV for this alleged -- purported

21  ownership change?

22  A.   Yes.

23  Q.   Let me put up on the screen what's been admitted as

24  Exhibit 10, page 2.  Mr. Levine, is this the application that

25  you forwarded to the RMV for the license?

1    A.    Yes, it is.

2    Q.    And you mark it as an ownership change -- or it is marked

3    as an ownership change?

4    A.    Yes.

5          MR. MERRITT:   Could we have 10?

6    Q.    And this is the corporate filing that is required by the

7    secretary of state for a corporation?

8    A.    Yes.

9    Q.    And were you required to send this to the RMV along with

10   your application?

11   A.    I believe I was, yes.

12   Q.    Now, scrolling down there, it indicates --

13         MR. MERRITT:   If you could just highlight the

14   directors?

15   Q.    -- Robert Peach as a director.   Do you see that?

16   A.    Yes.

17   Q.    Who instructed you to put Robert Peach's name down as the

18   director of the corporation?

19   A.    Simon did.

20   Q.    And was Robert Peach -- did he have any ownership in Libby

21   Corporation?

22   A.    No.

23   Q.    And was he an actual corporate director of Libby

24   Corporation?

25   A.    No.

1    Q.   Now, after you sent the applications in, was your station

2    inspected by someone from the RMV?

3    A.   Yes, it was.

4    Q.   And was it actually the defendant, David Gaw?

5    A.   Yes, it was.

6    Q.   And did you know him?

7    A.   Yes, I did.

8    Q.   How did you know him?

9    A.   I had known him throughout the time that I had been doing

10   inspections with the registry at my other location.

11   Q.   Can you just speak a little bit closer into the

12   microphone?

13   A.   Yes.  I had known Dave for a long time.  Since I was doing

14   inspections for so long, I think probably longer than -- I had

15   known Dave Gaw, I think, since he started with the registry

16   because I was in business.

17   Q.   In other words, do you know him professionally because his

18   job was to deal with these service station owners?

19   A.   Yes.

20   Q.   Did you have any other outside contact with him?

21   A.   No.

22   Q.   And did Mr. Gaw come and do the site assessment for

23   your -- the Georgetown station?

24   A.   Yes, he did.

25   Q.   Did you make some adjustments that he required, do you

1  recall?

2  A.   I think everything was in good order.  Oh, I did.  Before

3  that, yes, I had to make the bay a foot and a half longer than

4  it was because I didn't comply with the length of the bay for

5  the machines.

6  Q.   And you did that?

7  A.   I did that, yes.

8  Q.   Did you give anything to David Gaw?

9  A.   No.

10 Q.   Had Simon Abou Raad suggested that you do give him

11 something?

12 A.   Yes.

13 Q.   What did he say?

14 A.   He asked if I was going to give him a tip.

15 Q.   And what did you say?

16 A.   I said no, I wasn't.

17 Q.   I think you mentioned something called Parsons before.  Do

18 you know what Parsons is and how it interacts with your service

19 station?

20 A.   Parsons was a -- they were the director of the program.

21 As far as I knew, they ran the program for the registry, the

22 computer software and hardware, and they serviced it.

23 Q.   And did you have to mail something to Parsons to get the

24 inspections up and running?

25 A.   Yes, I had to send them an application.

1  Q.   If you could take a look at what's in front of you as

2  Exhibit 9, which is a mail receipt, do you recognize that?

3  A.   Yes.

4  Q.   What is that, Mr. Levine?

5  A.   That's a receipt for the application package that I sent

6  to Testcom, Inc., which I believe was Parsons or another

7  company that took over for Parsons.  I'm not sure.

8         MR. MERRITT:  Your Honor, I move in Exhibit 9.

9         MR. CINTOLO:  No objection.

10        THE COURT:  Okay.

11        (Government Exhibit No. 9 received into evidence.)

12 BY MR. MERRITT:

13 Q.   And so that's from Georgetown Mobil.  That's your service

14 station?

15 A.   Yes.

16 Q.   And you mentioned SGS Testcom.  That's in, it looks like,

17 Malta, New York?

18 A.   Yes.

19 Q.   And was this something that you had to do to get your

20 service station eventually up and running to do inspections?

21 A.   Yes.

22 Q.   When it -- when you were able to start doing inspections,

23 was the money released from escrow to Simon Abou Raad?

24 A.   Yes.

25 Q.   What effect did -- did the effect on the inspection

```
 1   license have on your business in Georgetown?
 2   A.   It helped.  It helped keep me going.
 3   Q.   Why did you go through Simon Abou Raad to get your
 4   inspection license?
 5   A.   Because I didn't think that there was any other way for me
 6   to get a license.
 7   Q.   Do you still own Georgetown Mobil?
 8   A.   No, I don't.
 9   Q.   When did you sell it?
10   A.   I sold it last October.
11   Q.   And how did you come out on the sale?
12   A.   Not very good.  I -- I had two purchase and sale
13   agreements that fell through because of the inspection machine,
14   and I ended up selling the business and the equipment for a lot
15   less than I had invested in the business.
16   Q.   And when you say "because of the inspection machine,"
17   because of the way in which the license was obtained?
18   A.   Yes.
19           MR. MERRITT:  No further questions, your Honor.
20           THE COURT:  Okay.  Mr. Cintolo?
21           MR. CINTOLO:  Thank you, your Honor.
22                         CROSS-EXAMINATION
23   BY MR. CINTOLO:
24   Q.   Good afternoon, Mr. Levine.
25   A.   Good afternoon.
```

1    Q.   Mr. Levine, you and I met for the first time today?

2    A.   Yes.

3    Q.   For about five minutes -- or three minutes outside.  I

4    asked you if you would answer some questions for me and you

5    said you would, correct?

6    A.   Yes.

7    Q.   And what I asked you is if you had known Dave Gaw,

8    correct?

9    A.   Yes.

10   Q.   And I asked you if he was a friend of yours, and you said

11   yes.  Is that correct?

12   A.   A friend or a -- I knew him, yeah.

13   Q.   You've known Dave since he operated the gas station close

14   to the gas station that you were operating about --

15            MR. CINTOLO:  How many years ago?

16            THE DEFENDANT:  Back in the '80s.

17   BY MR. CINTOLO:

18   Q.   Back in the '80s.  Do you remember that?

19   A.   I don't remember that.

20   Q.   With regard to your initial call to Mr. LaFrance, before

21   you called Mr. LaFrance did you call Dave Gaw?

22   A.   Yes, I did.

23   Q.   And did David tell you that there were no licenses

24   available?

25   A.   No, he didn't say that.

1    Q.    And what did he say?

2    A.    He referred me to Mark LaFrance.

3    Q.    So when you called Mr. Gaw, he simply referred you -- said

4    you got to call --

5    A.    He said he had nothing to do with it and that you have to

6    talk to Mark.

7    Q.    And you spoke with Mark?

8    A.    Yes.

9    Q.    And after you spoke with Mark, you learned that you had

10   only moved down one on the waiting list, correct?

11   A.    Yes.

12   Q.    And you serendipitously met Mr. Raad -- by chance met

13   Mr. Raad -- at a football game?

14   A.    Yeah.

15   Q.    And you told your story to Mr. Raad and he said, "I might

16   be able to help you out"?

17   A.    Yeah, correct.

18   Q.    Okay.  When you had that conversation with Mr. Raad at the

19   football game, he showed you that he was very friendly with

20   Mr. LaFrance, or tried to convince you that he was very

21   friendly with Mr. LaFrance, and showed you the contacts on his

22   phone listing Mr. LaFrance as one of his contacts?

23   A.    Yes.

24   Q.    Did he show you his contacts with regard to Mr. Gaw?

25   A.    No.

1    Q.   Did he tell you that he was friendly with Mr. Gaw?

2    A.   No.

3    Q.   Did he mention that Mr. Gaw would have anything to do with

4    regard to your getting a license or not getting a license?

5    A.   No.

6    Q.   Is it fair to say he never mentioned Mr. Gaw's name at

7    all?

8    A.   No.

9    Q.   Between the time that you met Mr. Raad at the football

10   game, at the Patriots game, until the time that Mr. Gaw came

11   down to do the inspection, had Mr. Raad ever mentioned

12   Mr. Gaw's name to you?

13   A.   No.

14   Q.   Had you spoken with Mr. Gaw during any of that time?

15   A.   Not that I recall, no.

16   Q.   Okay.  At least you didn't talk to him with regard to

17   getting the license, correct?

18   A.   No.  If anything, he referred me to Mark.

19   Q.   Okay.  He never spoke with you about licenses or anything

20   of that nature, correct?

21   A.   No.  He -- whenever I talked with him he said, "You have

22   to talk with Mark."

23   Q.   Okay.  Now, at some point in time, there needed to be an

24   inspection, correct?

25   A.   Correct.

1    Q.   And you were aware that there had to be an inspection,

2    correct?

3    A.   Yes.

4    Q.   And Mr. Gaw came down?

5    A.   Yes.

6    Q.   He came down to the new station and he did an inspection?

7    A.   Yes.

8    Q.   And after doing the inspection, he said to you, David,

9    Mr. Levine, the bay is too short.  Do you remember that?

10   A.   No.

11   Q.   Do you remember it was a foot and a half too short.  You

12   just told us about that a few minutes ago.

13   A.   Yeah, but that modification had already been done.

14   Q.   Okay.  He came down and he did a complimentary examination

15   so that you would know whether or not it met the specifications

16   before you even applied, right?

17   A.   I don't really recall whether he did or not, but I knew

18   that the bay had to be 30 feet long and that I only had 27 and

19   a half feet.

20   Q.   So you knew it was going to have to be corrected?

21   A.   Yes.

22   Q.   And did you discuss that at all with Mr. Gaw, if you

23   remember?

24   A.   When?

25   Q.   Any time.

```
 1   A.    I might have -- I think I might have asked him -- yeah, I
 2   think I did talk to somebody -- whether it was him or Mark
 3   LaFrance, I'm not sure, about asking why I had to make the
 4   building -- the bay a foot and a half longer when that foot and
 5   a half was not even used because there was no longer a
 6   dynamometer being used in the inspections that took up a lot of
 7   the space.  And that was obsolete and we didn't need that
 8   anymore.  And I tried not to have to spend another $10,000 to
 9   make the bay a foot and a half longer.
10   Q.    And you were basically -- the response to you was:  That's
11   the specification; that's what you need?
12   A.    Exactly.
13   Q.    Okay.  Was Mr. Gaw -- Mr. Gaw didn't cut you any slack?
14   A.    No.
15   Q.    Did he ever threaten you?
16   A.    No.
17   Q.    Did he ever say that if you don't deal with Mr. LaFrance
18   with regard to this, then they're going to make it tough on you
19   any time you do an inspection?
20   A.    No.
21   Q.    And he didn't say that, did he?
22   A.    No.  No.
23   Q.    Did he ever come down and deal with you again with regard
24   to that?
25   A.    No.
```

1    Q.   Did you ever discuss the purchase with him?  When I say

2    "the purchase," the purchase of the license with him.

3    A.   No.

4    Q.   Did you ever discuss any of the qualifications such as the

5    corporate officers with him?

6    A.   No.

7    Q.   Did you ever tell him that you were putting down a

8    corporate officer who wasn't really a corporate officer?

9    A.   No.

10            MR. CINTOLO:  Thank you, Mr. Levine.

11            MR. MERRITT:  No further questions, your Honor.

12            THE COURT:  All right, Mr. Levine.  Thank you.  You

13   may step down.

14            THE WITNESS:  Thank you.

15            (The witness is excused.)

16            MR. BERLIN:  Your Honor, the United States re-calls

17   Special Agent Mark Toulouse.

18                    MARK TOULOUSE, re-called

19                 CONTINUED DIRECT EXAMINATION

20   BY MR. BERLIN:

21   Q.   Special Agent Toulouse, could you remind the jury who you

22   are.

23   A.   Special Agent Mark Toulouse with the Boston division of

24   the FBI.

25   Q.   You testified earlier today regarding a court-authorized

1    monitoring of Simon Abou Raad's cell phone?

2    A.    I did.

3    Q.    And a number of calls were selected to be played at this

4    trial?

5    A.    That's correct.

6              MR. BERLIN:  Your Honor, may I approach?

7              THE COURT:  You may.

8    BY MR. BERLIN:

9    Q.    Now, I've just handed you what's been previously marked as

10   Government's Exhibit 6 as well as the binder of transcripts.

11   Is that right?

12   A.    That's correct.

13   Q.    And that's the disk that contains the calls we were

14   discussing?

15   A.    That is correct.

16   Q.    Now, as you listen -- you listened to the calls in the

17   course of your investigation?

18   A.    I did.

19   Q.    As you listened to the calls, did you hear the

20   participants discuss an individual named Frank Pignatare?

21   A.    I did.

22   Q.    And who was he?

23   A.    Frank Pignatare was a service station owner in Agawam.

24             MR. CINTOLO:  Your Honor, I would object.  "Did you

25   hear the people talking."  Could we have some specification as

1  to who's talking about Pignatare?

2  BY MR. BERLIN:

3  Q.   Who was discussing Mr. Pignatare on the calls?

4  A.   I know Mr. Abou Raad and Mr. LaFrance did.

5  Q.   What about an individual named Michael Youssef?  Did you

6  hear the participants discuss Michael Youssef?

7  A.   I did.

8  Q.   And who did you hear discuss Mr. Youssef?

9  A.   Mr. Abou Raad, Mr. LaFrance and Mr. Gaw.

10 Q.   And who was Mr. Youssef?

11 A.   Mr. Youssef was and is a service station owner in

12 Stoneham, Massachusetts.

13 Q.   And generally, what did they discuss regarding those

14 individuals?

15 A.   They -- generally speaking, they discussed his desire to

16 purchase an inspection license machine.

17 Q.   Mr. Youssef's desire?

18 A.   Mr. Youssef's desire to acquire the licensing machine,

19 correct.

20 Q.   Now, I'm going to play Exhibit 6E.

21      Before we start playing Exhibit 6E, was this recording

22 from December 13, 2013?

23 A.   December 13, 2013.  That's correct.

24 Q.   And who are the participants on this call?

25 A.   Simon Abou Raad and Mark LaFrance.

```
 1              (Audio recording played.)
 2   Q.   Now, on this call, where is Mr. -- Mr. Abou Raad is
 3   talking with Mr. LaFrance.  Where is Mr. Abou Raad going?
 4   A.   He's driving to Agawam, Massachusetts, to meet with
 5   Mr. Pignatare.
 6   Q.   Now, near the beginning of the call you hear a reference
 7   to a piece of paper coming through with an RMV header on it?
 8   A.   Yes.
 9   Q.   And Mr. LaFrance says, "I want you to cut it off"?
10   A.   That's correct.
11   Q.   And there's some discussion about whether or not there is
12   a header?
13   A.   There is.
14   Q.   Do you understand what that document was?
15              MR. CINTOLO:  Objection, your Honor.
16              THE COURT:  Sustained.
17   BY MR. BERLIN:
18   Q.   Now, later in the conversation Mr. LaFrance says, "He may
19   ask you did you hear from the registry or anything like that,
20   and of course you say no."  Do you understand who Mr. LaFrance
21   is referring to there as "he"?
22   A.   I do.
23              MR. CINTOLO:  Objection, your Honor.  Move to strike.
24              THE COURT:  No, you may answer that.
25              THE WITNESS:  I do.
```

1    BY MR. BERLIN:

2    Q.    And who is he?

3    A.    "He" refers to Mr. Pignatare.

4    Q.    Now, in the conversation Mr. Abou Raad says, "I'm sick of

5    these fuckin' people crying, 'I don't have a machine.'  I'm

6    sick of this bullshit.  We got rid of them.  We got rid of them

7    and before you know it we have a fuckin' desperate guy with a

8    fuckin' lot of money and we've got to turn them away.  We've

9    got nothing.  I'm sorry."

10        And Mr. LaFrance says, "That's right.  These are hard to

11   get."

12        Do you know what Mr. LaFrance means when he says "these

13   are hard to get"?

14            MR. CINTOLO:  Objection, your Honor.

15            THE COURT:  Let me see you for a minute.

16            (Discussion at sidebar and out of the hearing of the

17   jury:)

18            THE COURT:  So if you're just asking him his

19   understanding of the meaning of the tape, then I think the

20   objection is well taken; if you're calling upon his general

21   investigative knowledge, then I think you perhaps have more

22   leeway.  But I think what matters is what the jury thinks you

23   mean.

24            MR. BERLIN:  Sure.  I understand.

25            (In open court:)

BY MR. BERLIN:

Q.   Now, based on your investigation, when Mr. LaFrance says "these are hard to get," do you understand what he's referring to?

A.   I do.

Q.   And what is he referring to?

A.   He's referring to the inspection licenses, machines, saying that they're hard to -- they're hard to acquire.

Q.   Now, later in the conversation Mr. LaFrance says, "The building's been sold and there was a note in his folder that he had faxed to the registry and which is now in my briefcase"?

A.   Yes.

          MR. BERLIN:  Your Honor, may I approach?

Q.   Now, I'm showing you what's been previously admitted as Government's Exhibit 11.  Do you recognize this document?

A.   I do.

Q.   And what is it?

A.   It's a letter Mr. Pignatare sent to the Registry of Motor Vehicles basically saying he's selling his station and he's all done with his inspection license.

Q.   And how was this document obtained?

A.   This document was obtained from Mr. Pignatare.

Q.   Now, have you had the opportunity to review the RMV's file on -- regarding Stoneham Autoworks supposedly merging with Frank Pignatare's Auto Service Center?

1    A.    I have.

2    Q.    And was this document in that file?

3    A.    That document was not in the file.

4    Q.    Now, later in the call Mr. LaFrance says, "You have to

5    change some of the letters that you've been sending out.  They

6    all look the same."  Mr. Abou Raad said, "This is going to have

7    a letterhead."

8         Mr. LaFrance says, "It's going to have a letterhead.

9    Maybe you could drop a, I don't know, picture of a car or

10   something up there or whatever.  I don't know but it's

11   gotta -- it's gotta be a little different -- different font."

12        And then Simon Abou Raad says, "Different address.

13   Different address, different fuckin' notary public."

14        And eventually Mr. Abou Raad says, "I want to change the

15   notary public."

16        Do you understand based on your investigation what letters

17   they're discussing here?

18             MR. CINTOLO:  Objection, your Honor.

19             THE COURT:  Overruled.  You may answer.

20             THE WITNESS:  I do.

21   BY MR. BERLIN:

22   Q.    And what letters are they talking about?

23   A.    When Mr. LaFrance and Mr. Abou Raad were working on a

24   merger, Mr. Abou Raad would make these --

25             MR. CINTOLO:  Objection, your Honor.  It's beyond the

1    scope of the question.

2              THE COURT:  No, overruled.

3              MR. CINTOLO:  May I approach sidebar, your Honor?

4              THE COURT:  Okay.

5              (Discussion at sidebar and out of the hearing of the

6    jury:)

7              MR. CINTOLO:  Your Honor, there's absolutely no

8    foundation as to when the rest of his investigation occurs, so

9    if you ask somebody, "As a result of your investigation did you

10   learn something," they don't know what the investigation is.  I

11   don't know, this is obviously coming from the tape.  I don't

12   know what their investigation is that would link those two

13   things.  They have to set up a predicate for it, your Honor.

14             MR. BERLIN:  When Special Agent Ring testified, he

15   said he was co-case agents with Agent Toulouse.  On

16   cross-examination Mr. Cintolo said:  That means you controlled

17   the investigation, you did the entire investigation, you did

18   all the steps in the investigation.  Special Agent Toulouse had

19   the knowledge based on his investigation that could shed light

20   on what's being explained here.

21             THE COURT:  Yeah.  The objection is overruled.

22             MR. CINTOLO:  Judge -- your Honor, explain what the

23   knowledge is.  How did he get it?

24             THE COURT:  I'll allow it.

25             (In open court:)

1    BY MR. BERLIN:

2    Q.   So again, based on your investigation, what are those

3    letters they're discussing?

4    A.   The letters they're discussing in this call -- basically,

5    when they were -- Mr. Abou Raad and Mr. LaFrance were creating

6    a merger, transferring licenses with the merger, Mr. Abou Raad

7    would create letters that were supposed to be from the original

8    license-holder.  He would create a letter, and forged the

9    letter with the original license-holder's name.  And in the

10   letter he would say, My name is -- the original

11   license-holder's name -- and I want to merge with the buyer --

12   he would say the buyer's name -- for a variety of reasons, and

13   then the letter -- that letter would get sent to the registry.

14   That's what they're referring to when they're talking about the

15   letters here.

16   Q.   Now, I'd like to show you Exhibit 12, I think A.  Have you

17   seen Exhibit 12A before?

18   A.   I have.

19   Q.   And where was Exhibit 12A from?

20   A.   We -- I believe we took that out of -- we got that from a

21   search we did at the Registry of Motor Vehicles that came out

22   of the folder for the Stoneham Autoworks' folder.

23   Q.   And have you had the opportunity to compare that signature

24   here with the signature on that last document?

25   A.   Yes, I have.

1    Q.   And are they the same?

2    A.   The last document, you mean Exhibit 11, the letter from

3    Mr. Pignatare?

4    Q.   Yes.

5    A.   They are not the same.

6    Q.   And here on -- do you see on the top of the left where

7    there is now a letterhead, a picture of a repair with --

8    A.   I do.

9    Q.   And do you see here on the bottom, on the bottom right?

10             MR. BERLIN:  If you could blow that up.

11   Q.   What's that?

12   A.   That's a notary public seal or stamp.

13   Q.   Now, you were saying on this call they're discussing

14   purchasing a machine from Mr. Pignatare?

15   A.   That's correct.

16   Q.   At some point was that machine sold to somebody?

17   A.   It was.

18   Q.   Who located the buyer that was involved in purchasing the

19   machine?

20   A.   Mr. Gaw did.

21   Q.   And did you monitor calls about that sale?

22   A.   Yes.

23   Q.   I'm going to play for you Exhibit 6F.

24             (Audio recording played.)

25   Q.   Now, just to be clear, in the center -- in the middle of

1    the conversation when they're discussing something, buying

2    something either new or used, based on your investigation

3    they're not discussing buying or selling an inspection machine?

4    A.   That's correct.

5    Q.   But the reference to Mike, and at the beginning Mike from

6    Stoneham, do you know who that's a reference to?

7    A.   I do.

8    Q.   And who is that?

9    A.   Mr. Youssef.  Mike Youssef.

10   Q.   And that's the Mr. Youssef that you discussed about who

11   purchased a machine?

12   A.   Correct.

13   Q.   Did Mr. -- did you overhear additional calls in which

14   Mr. Gaw discussed -- discusses getting a license for

15   Mr. Youssef with Simon Abou Raad?

16   A.   Yes.

17   Q.   I'm going to play for you Exhibit 6G.

18            (Audio recording played.)

19   Q.   Now, when Mr. Gaw says, "What's up?  Did that kid get

20   ahold of you?  He's all set to go," do you know who he's

21   referring to there?

22   A.   Yes, he's referring to Mr. Youssef.

23   Q.   And he says, "I haven't heard anything from Angelina," and

24   then later in the call Mr. Abou Raad says, "I'm not going to

25   send any paper to Angelina until they put the money in escrow."

1   And then later, "The paperwork will go to Angelina most likely

2   on -- tomorrow or maybe Monday.  So by next week she'll call

3   you."  Do you know who Angelina is?

4   A.    I do.

5   Q.    And who is Angelina?

6   A.    Angelina Echeverria was a secretary within the RMV Vehicle

7   Safety division who handled the paperwork for these mergers.

8   Q.    And do you know what her relationship was with Mr. Gaw in

9   respect to these mergers?

10  A.    A couple of times -- they would exchange paperwork.

11  Sometimes Mr. Gaw would send her paperwork after an inspection

12  and sometimes she would send him paperwork indicating that an

13  inspection needs to be initiated at a certain service station.

14  Q.    Now, there's a reference in the middle where Mr. Abou Raad

15  says, "I mean, I told him, I said, 'The last time we did was

16  fuckin' four weeks.  You remember the last one?"  Gaw says,

17  "Yup.  Yup."

18       Abou Raad said, "Was four weeks.  As long as he supplies

19  me with the right paperwork," and Gaw says, "Yup."

20       The reference to four weeks, do you understand what the

21  time frame they're talking about there is?

22            MR. CINTOLO:  Objection, your Honor.

23            THE COURT:  No, you may answer it.

24            THE WITNESS:  I do.

25  BY MR. BERLIN:

megen

1    Q.   And what are they talking about?

2    A.   I believe they're talking about the time from the initial

3    paperwork to Angelina and the inspection application is sent

4    out to the time when the individual who owns the service

5    station is actually able to perform inspections.

6    Q.   Now, Mr. Abou Raad says, "Who wants to -- I mean, who's

7    going to go to him with the site assessment?  You are?" Mr. Gaw

8    says, "Probably, yeah."  Mr. Abou Raad, "It's your area, yes."

9    Mr. Gaw says, "You got it."  And Mr. Abou Raad says, "Very

10   good."

11        Do you understand what a site assessment is?

12   A.   I do.

13   Q.   And what is that?

14   A.   It's the initial assessment to determine whether or not a

15   service station is -- has all the necessary sizes and whether

16   it conforms to the RMV's regulations for actually performing

17   vehicle safety inspections.

18   Q.   And did Mr. Gaw perform those inspections?

19   A.   He did.

20   Q.   As part of his job?

21   A.   Yes.

22   Q.   Now, when Mr. Abou Raad said, "I'm not going to send any

23   paper to Angelina," did you review the RMV file for Stoneham

24   Autoworks?

25   A.   I did.

1    Q.   Was there any paper in there that indicates it is from

2    Mr. Abou Raad?

3    A.   No.

4         THE COURT:  Mr. Berlin, if you're finished with that

5    call, let me see counsel at the side, please.

6         (Discussion at sidebar and out of the hearing of the

7    jury:)

8         THE COURT:  We're moving right along.  I just want to

9    get a sense, is it possible -- tell me what you're going to do.

10        MR. MERRITT:  I think -- your Honor, at this point I

11   think we've got another three calls in the sequence, then we

12   have Mr. Youssef.  And then Mr. Toulouse's got about seven more

13   calls, and then Agent Moran is going to testify about his

14   interview with the defendant and the search.

15        So we will probably finish sometime in the morning.

16   We will finish tomorrow.

17        THE COURT:  Well, I think that's right.  That's what I

18   was getting at, is how soon.  I mean, is it likely we would

19   proceed -- because if it is, I want to tell the jury, but if

20   it's probably more likely that it will be Thursday.

21        MR. MERRITT:  I think so.

22        MR. CINTOLO:  Yeah.

23        MR. MERRITT:  Yeah.

24        MR. CINTOLO:  So can we plan on Thursday, Judge?

25        THE COURT:  More or less.

1          MR. BERLIN:  Your Honor.

2          THE COURT:  Well, you know, I don't want to have

3    it -- I don't want it to wrap up at ten o'clock.

4          MR. CINTOLO:  I know.  But what I'm trying to say is

5    it's whether or not I prepare tonight for closing.

6          THE COURT:  Yeah, what's the combined length of the

7    calls, roughly?  20 minutes?

8          MR. MERRITT:  Roughly 40 minutes.

9          THE COURT:  40 minutes?  Yeah.  Yeah, I think you can

10   count on Thursday.

11         MR. CINTOLO:  Thank you.

12         THE COURT:  That will be orderly for everybody, and

13   me.

14         MR. BERLIN:  Do you instruct the jury prior to closing

15   or after closing?

16         THE COURT:  Both.  I give them the substantive charge

17   before closing and then I do the evaluation of the evidence,

18   reasonable doubt and all of that stuff, afterwards.  But they

19   will have heard the charge on the elements of the offenses

20   before you argue.

21         MR. CINTOLO:  And do you send a written copy?

22         THE COURT:  I don't know if the reporter knows this

23   yet, but I'm going to ask her to do up -- I don't read my

24   instructions, so even though I have a script I vary from it

25   freely, so that's not an accurate version of my charge.  But

1    we'll have a transcript -- I think in this case because of the

2    nature of the charges and the similarity of some of them, it

3    will be helpful for the jury from the outset to have a copy of

4    the charge.

5          Now, you can think about whether you want the whole

6    charge or just the substantive elements part because there will

7    be two separate segments.  And I've done both.  Sometimes I've

8    just sent the elements back -- because there's no controversy

9    about the other.

10         MR. CINTOLO:  If I start swinging at these sidebars

11   its because of this music.

12         MR. BERLIN:  Thank you, your Honor.

13         MR. CINTOLO:  Thank you, Judge.

14         (In open court:)

15         THE COURT:  All right, jurors.  We've reached one

16   o'clock.  We're going to recess for the day.  We're making good

17   progress.  That's what I was checking on.  I think it's likely

18   we'll finish the evidence tomorrow, and it is, therefore,

19   likely we will continue to the closing statements,

20   instructions, and your beginning deliberations on Thursday.  So

21   if you would plan accordingly.

22         I remind you once deliberations begin it will go from

23   a nine-to-one-day to a full day if necessary, just for your

24   heads-up.  And, again, please avoid any discussion of the case

25   or any contact with any outside information about these

1    matters.

2          With that, enjoy the rest of the day and we'll see you

3    tomorrow morning.

4          THE CLERK:  All rise for the Court and the jury.  The

5    Court will be in recess.

6          (The Court and jury exit the courtroom and the

7    proceedings adjourned at 1:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 13-10194-GAO,

 8     United States of America v. David P. Gaw.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  2/12/15
13

14

15

16

17

18

19

20

21

22

23

24

25
```